LAW OFFICES OF MARC LIBARLE
Marc Libarle (*State Bar No. 071678*)
ml7006@gmail.com
1388 Sutter Street, Suite 910
San Francisco, CA 94109
Phone: (415) 928-2400

HALLER LAW PLLC
Timothy J. Haller (*Admitted Pro Hac Vice*)
haller@haller-iplaw.com
53 West Jackson Boulevard, Suite 1623
Chicago, IL 60604
Phone: (630) 336-4283

NOBLE IP LLC
Gabriel I. Opatken (*Admitted Pro Hac Vice*)
gabriel@nobleipllc.com
418 North Noble Street, Suite 4
Chicago, IL 60642
Phone: (773) 648-5433

*Attorneys for Plaintiffs DDC Technology, LLC and DODOCASE VR, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **DDC TECHNOLOGY, LLC AND DODOCASE VR, INC.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**MERCHSOURCE, LLC (dba SHARPER IMAGE) AND THREESIXTY BRANDS GROUP LLC (dba SHARPER IMAGE),**<br><br>**Defendants.** | **Case No. 3:17-cv-07088-EDL**<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF CONTRACT** |

Plaintiffs DDC Technology, LLC ("DDC") and DODOCASE VR, Inc. ("DODOCASE") complain of Defendants MerchSource, LLC (dba Sharper Image) ("MerchSource") and ThreeSixty Brands Group LLC (dba Sharper Image) ("ThreeSixty") as follows:

### NATURE OF LAWSUIT

1.  This is a Second Amended Complaint for declaratory judgment and injunctive relief under 28 U.S.C. §§ 1331 and 2201, as well as breach of contract based on this Court's

supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as a result of events occurring after the filing of the original Complaint.

2. In pursuing such Second Amended Complaint, Plaintiffs rely on 35 U.S.C. §§ 282 and 283.

3. Defendant MerchSource originally breached the terms of a Master License Agreement ("MLA") between DODOCASE and MerchSource by, *inter alia*, refusing to make payment of agreed-upon royalties in a timely manner and refusing to provide assurances that it would comply with its marking obligations. MerchSource belatedly cured its non-payment breach by providing its 2017 Q3 royalty payment; yet, MerchSource still failed to provide assurances that its marking obligations would be satisfied with respect to the newly-issued '117 and '184 Patents.

4. After the filing of the Original Complaint in this action, MerchSource again materially breached the MLA by (a) threatening to challenge the DODOCASE Patents (as defined below) via Patent Trial and Appeal Board ("PTAB") proceedings on January 12, 2018 (in an effort to extort a more favorable royalty rate in exchange for keeping the alleged prior art "confidential"), disclosing alleged prior art in support of that threat for the first time on January 15, 2018, and filing PTAB petitions in contravention of the MLA's venue and "no-challenge" provisions that same afternoon; (b) failing to make its required payment on January 30, 2018, and (c) failing to provide assurances that its marking obligations would be satisfied with respect to the newly-issued '117 and '184 Patents. MerchSource then failed to cure those breaches by the cure deadline of February 13, 2018 (per written notice by email of January 14, 2018). Accordingly, DODOCASE terminated the MLA on February 14, 2018.

5. Thus, Defendants obtained all of the benefits of the MLA, without meeting their obligations thereunder, while attempting to renegotiate a new agreement with a more favorable royalty rate. Then, having failed at their efforts to extort DODOCASE, Defendants breached the no-challenge and forum selection clauses of the MLA to create a two-front litigation scenario in a further attempt to pressure DODOCASE.

6.    On October 16, 2018, DODOCASE transferred to DDC all right, title and interest in and to the DODOCASE Patents, including all causes of action and enforcement rights for past, current and future infringement of the DODOCASE Patents.

7.    Accordingly, Plaintiffs seek: (a) a declaration that, despite Defendants' counterclaims to the contrary, the below-identified DODOCASE Patents are valid and enforceable; (b) an Order enjoining Defendants from further breaches of the MLA and/or infringement of the DODOCASE Patents; (c) an Order finding that Defendant MerchSource breached the MLA and ordering Defendants to promptly provide payment for royalties due at least through January 15, 2018 (with interest, costs and attorneys' fees); and (d) continuing pursuit of the preliminary injunction (ECF 52), Ordering Defendants to withdraw their invalidity challenges filed with the PTAB in violation of the MLA as negotiated freely by the parties (which is presently pending appeal to the Federal Circuit).

## THE PARTIES

8.    DDC Technology, LLC ("DDC") is a Delaware limited liability company with a registered agent of Incorporating Services, Ltd., 3500 South Dupont Highway, Dover, Delaware 19901.

9.    DODOCASE VR, Inc. (formerly known as DODOcase, Inc. and predecessor-in-interest to the DODOCASE Patents and the MLA) ("DODOCASE") is a Delaware corporation with a registered agent of The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 and headquarters located at 337 Linda Way, Mill Valley, California 94941.

10.    DODOCASE was founded by Patrick Buckley and Craig Dalton in 2010 in the basement of Patrick Buckley's home. They started the company with the mission of making mobile device accessories that were built by local craftsman. For the past seven years they have been manufacturing and selling mobile device accessories made in the United States of America. Most of their products are built in a factory they built themselves in San Francisco. DODOCASE has sold millions of products and is recognized globally as a premium brand for mobile accessories.

11.    In 2014, DODOCASE anticipated a growing mobile device accessories market, particularly for affordable virtual reality accessories that worked with smartphones. Patrick Buckley, an MIT trained mechanical engineer and inventor of multiple patents, recognized some breakthrough improvements that could be made to the state of the art for smartphone virtual reality accessories at the time and filed for patent protection implicating an innovative way to make a low-cost virtual reality input system for touchscreen devices. DODOCASE launched four virtual reality smartphone accessories in 2014 and has since sold over one-million smartphone virtual reality viewers.

12.    In 2016, DODOCASE was forced to abandon the sale and production of products that used its own patented technology because of severe price pressures placed on it by competitors making products outside of the United States.

13.    DODOCASE has been awarded multiple patents for virtual reality technology, including those asserted herein. Pursuant to a Patent Purchase Agreement dated October 16, 2018, DDC is now the named assignee of, owns all right, title and interest in, and has standing to sue for infringement of United States Patent No. 9,420,075, entitled "Virtual Reality Viewer and Input Mechanism," which issued on August 16, 2016 ("the '075 Patent") (a true and correct copy is attached as Exhibit A); United States Patent No. 9,723,117, entitled "Virtual Reality Viewer and Input Mechanism," which issued on August 1, 2017 ("the '117 Patent") (a true and correct copy is attached as Exhibit B); and United States Patent No. 9,811,184, entitled "Virtual Reality Viewer and Input Mechanism," which issued on November 7, 2017 ("the '184 Patent") (a true and correct copy is attached as Exhibit C). The foregoing patents are collectively referred to herein as the "DODOCASE Patents".

14.    During prosecution of the three DODOCASE Patents, the Examiner(s) considered over two-dozen prior art references. Of particular note, the Examiner(s) considered U.S. Patent No. 9,423,827 ("Compton") and at least two non-patent references related to Google Cardboard.

15.    Defendant MerchSource, LLC ("MerchSource") is a Delaware limited liability company with a Delaware listed registered agent of Corporation Service Company, 251 Little Falls

Drive, Wilmington, Delaware 19808. MerchSource also maintains an office at 15 Cushing, Irvine, California 92618.

16. MerchSource states on its website (at merchsource.com/about.php): "MerchSource ideates, designs, sources and distributes consumer products to the nation's largest retailers. MerchSource has developed long-standing multi-department retail relationships based around its diverse product line – which includes toys, electronics, home décor and many other categories. From its design and development headquarters in Southern California, MerchSource crafts from-scratch industrial designs and best-in-class packaging. Using its diverse brand portfolio, MerchSource builds successful cross-category programs that can be found throughout major retailers nationwide. With its large-scale Asia operation (with offices in Hong Kong and throughout China), MerchSource is one of the only major retail suppliers to own and control its sourcing capabilities. As a full-service, vertically-integrated supplier, retailers rely on MerchSource as a key vendor and a trusted sourcing partner."

17. Specific to this Complaint, MerchSource sells, offers to sell, manufactures, designs and/or imports products that infringe the DODOCASE Patents absent payment of the agreed royalties under the MLA, at least under the brand name "Sharper Image."

18. Defendant ThreeSixty Brands Group LLC ("ThreeSixty") is a Delaware limited liability company with a Delaware listed registered agent of The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

19. MerchSource is wholly owned by ThreeSixty Group Limited, a privately-held Hong Kong company and, upon information and belief, MerchSource internally operates as a division of ThreeSixty.

20. Upon information and belief, on or about December 30, 2016, ThreeSixty acquired the Sharper Image brand. ThreeSixty is the owner-assignee of the trademark, "Sharper Image."

21. ThreeSixty previously stated on its website, now under construction (at http://thethreesixtygroup.com/about.php): "ThreeSixty Group ideates, designs, sources and distributes consumer products to the nation's largest retailers. ThreeSixty has developed long-

standing multi-department retail relationships based around its diverse product line – which includes toys, electronics, home décor and many other categories. From its design and development headquarters in Southern California, ThreeSixty crafts its from-scratch industrial designs and best-in-class packaging. Using its diverse brand portfolio, ThreeSixty builds successful cross category programs that can be found throughout major retailers nationwide. With its large-scale Asia operation (with offices in Hong Kong and throughout China), ThreeSixty is one of the only major retail suppliers to own and control its sourcing capabilities. As a full-service, vertically-integrated supplier, retailers rely on ThreeSixty as a key vendor and a trusted sourcing partner."

22.     Specific to this Complaint, ThreeSixty sells, offers to sell, manufactures, designs and/or imports products that infringe the DODOCASE Patents (absent payment of the agreed royalties under the MLA), at least under the brand name "Sharper Image."

## JURISDICTION AND VENUE

23.     This Court has exclusive jurisdiction over the subject matter of the original and Amended Complaints under 28 U.S.C. §§ 1331, 1338(a) and 2201. This Court further has supplemental jurisdiction over the breach of contract claim in this Amended Complaint under 28 U.S.C. § 1367.

24.     Personal jurisdiction is proper in this Court – and Defendants have so consented. (See Ans. to Compl., ¶ 19). Additionally, the MLA states: "THE PARTIES AGREE THAT THE SUBJECT MATTER AND PERSONAL JURISDICTION ARE PROPER IN THE COURTS LOCATED IN SAN FRANCISCO COUNTY OR ORANGE COUNTY, CALIFORNIA." Further, Defendants have extensive contacts with the State of California, including with this Judicial District; and Defendants have purposefully availed themselves of the privileges of conducting business in the State of California, including through the sale and offer for sale of the Defendant Products throughout the State of California and this Judicial District.

25.     Venue is proper in this Court – and Defendants have so consented. (See Ans. to Compl., ¶ 20). Additionally, the MLA provides: "DISPUTES *SHALL* BE LITIGATED BEFORE

THE COURTS IN SAN FRANCISCO COUNTY OR ORANGE COUNTY, CALIFORNIA." (Bold and italic emphasis added). Further, venue in this judicial district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this Judicial District.

## PREVIOUS RELATIONSHIP WITH MERCHSOURCE AND
## THE PRESENT CASE OR CONTROVERSY

26.    On or about June 16, 2016, MerchSource contacted DODOCASE to inquire about obtaining a license to the '075 Patent.

27.    On or about October 3, 2016, DODOCASE and MerchSource entered into the MLA regarding the DODOCASE Patents.

28.    The MLA states, *inter alia*, "MerchSource desires to manufacture and sell virtual reality viewer products having a capacitive touch input mechanism containing the Licensed IP."

29.    Starting on or around June 9, 2017, MerchSource (through General Counsel Jenny Wang) began to correspond with DODOCASE expressing dissatisfaction with the MLA executed after arms-length negotiations. Specifically, MerchSource stated: (a) that DODOCASE was not enforcing its intellectual property adequately, (email of June 9, 2017); (b) that it had become unfeasible for MerchSource to continue selling its licensed products, (email of June 14, 2017); (c) that MerchSource desired to amend the MLA to a lower royalty rate and with new rights for MerchSource to enforce the DODOCASE Patents (id.); and (d) that MerchSource was ready to cease selling the licensed products, resulting in a royalty rate of zero, (id.).

30.    On or around July 10, 2017, MerchSource (through present-counsel Mark C. Johnson) contacted DODOCASE (via Craig Dalton) and threatened (without justification under the MLA): "Accordingly, to protect the respective rights under the Agreement, MerchSource requests that DODOcase take immediate action to remove [various third-party] products from the marketplace no later than July 31, 2017. Should DodoCase fail to take remedial enforcement action, MerchSource will have no choice but to impute a zero percent royalty rate under the [MLA] in order to be similarly advantaged." DODOCASE had no such obligation; however, on August

23, 2017, DODOCASE commenced a third-party enforcement action on the DODOCASE Patents, in the United States District Court, for the District of Delaware styled *DODOcase, Inc. v. DGL Group LLC and DGL Group Ltd.*, Civil Action No. 1:17-cv-01188. That action has settled.

31.     On or around July 14, 2017, DODOCASE (through counsel) responded and set forth its position regarding the MLA and reiterated that any manufacture, use, sale or offer for sale of the Defendant Products required the corresponding agreed-upon payment. Specifically, DODOCASE's letter stated:

> Merchsource's threat to "impute a zero percent royalty rate under the Agreement ... [s]hould Dodocase fail to take remedial enforcement action" is premised entirely on rights that Merchsource does not possess under the Agreement.
>
> Accordingly, Dodocase does not consent to any modification of the royalty rate of [] percent ([]%) of Net Sales Price, as set forth in the Agreement. If Merchsource is dissatisfied with the royalty rate or terms of the Agreement that Merchsource freely entered into on a negotiated basis and with the advice of counsel, Merchsource is free to: discontinue the sale of any and all Licensed Products in the US; or continue selling the Licensed Products in the US market at the agreed upon [] percent ([]%) royalty rate.
>
> Should Merchsource proceed as threatened and make, use, sell or offer for sale Licensed Products without payment of the agreed upon [] percent ([]%) royalty rate, Dodocase will have no choice but to consider all legal remedies available through the courts to enforce the Agreement and, pursuant to Section 13.11 of the Agreement, will be entitled to all costs, expenses and fees associated with the enforcement of the Agreement.

32.     On or about October 5, 2017, MerchSource (through counsel Mark C. Johnson) again wrote directly to DODOCASE (via Craig Dalton) stating: "We have reviewed the Licensed Patents, including the allowed claims of U.S. Patent Application Serial No. 15/448,785 [the application for the later-issued '184 Patent], and have concluded that all relevant claims are invalid under 35 U.S.C. § 102 and/or § 103. Accordingly, MerchSource will not be paying royalties on any products sold hereafter." MerchSource did not identify any prior art for DODOCASE to consider and, despite multiple opportunities and requests to do so, Defendants did not identify any prior art until January 15, 2018. Instead, Defendants continued attempts to renegotiate the MLA

to a lower royalty rate (including discussions about extending the term of the MLA to the life of the DODOCASE Patents), while still marking their products with the '075 Patent.

33. DODOCASE replied to MerchSource's counsel on or about October 17, 2017 reiterating that refusal to pay royalties despite continued manufacture, use, sale and/or offer for sale constituted a breach of the MLA. DODOCASE's October 17 correspondence further provided notice per the MLA of MerchSource's need to cure its material anticipatory refusal to pay the agreed-upon royalties and threatened infringement through unauthorized manufacture, use, sale and/or offer for sale of the Defendant Products in the future.

34. On October 17 and November 2, 2017, DODOCASE informed MerchSource of the issuance of the two continuation patents (the '117 Patent and the '184 Patent, respectively) and MerchSource's obligation to mark the Licensed Products accordingly. MerchSource never confirmed that it would comply with its marking obligations. Accordingly, MerchSource's silence regarding marking indicated further intention to materially breach the MLA.

35. As a result of DODOCASE's October 17, 2017 notice, the deadline for MerchSource to cure its refusal to pay the agreed-upon royalties for 2017 Q3 was November 16, 2017.

36. On November 17, 2017, one day after the cure deadline, MerchSource sent an email correspondence with a copy of a royalty check (not the "wire" required by the MLA) and a royalty report for 2017 Q3. Notably, however, the royalty report included the following statement: "Attached is the royalty payment for Q3 pursuant to the License Agreement, provided however MerchSource considers the dispute over royalty rate and owed royalties under the Agreement outstanding and not yet resolved." Thus, while MerchSource made no further suggestion of patent invalidity, DODOCASE remained concerned that MerchSource would again breach the MLA by failing to pay the 2017 Q4 royalty.

37. Accordingly, MerchSource's previous breaches of the MLA (though partially cured regarding payment for 2017 Q3), and stated reservation of any disputes regarding royalty rate and owed royalties, created a real case or controversy (as of the filing of the original Complaint)

between the parties with respect to the question of whether the DODOCASE Patents are valid and enforceable. As set forth below, MerchSource's most-recent breaches of the MLA, including non-payment of royalties and Defendants' actual challenges to the DODOCASE Patents (via the filing of PTAB petitions on January 15, 2018), and Defendants' Answer to the original Complaint (including counterclaims for invalidity) have further solidified the case or controversy between the parties.

**DEFENDANTS' CONDUCT SINCE THE FILING OF THE ORIGINAL COMPLAINT**

38. DODOCASE filed the Original Complaint in this action on December 13, 2017.

39. Between December 19 and 22, 2017, Defendants (via counsel Mark C. Johnson) requested an extension of time to answer or otherwise plead. In support of these requests, Defendants cited: "the holidays," "the potential opportunity for the parties to resolve this dispute without Court intervention," attorneys "out of the office," individuals from MerchSource "unavailable," and Defendants' counsel's location in Cleveland.

40. Unable to reach agreement as to the length of extension, on December 22, Defendants filed their Motion for Extension of Time, stating in pertinent part:

> MerchSource seeks the extension so that it can more fully investigate and analyze the allegations in the Complaint in order to better respond to the Complaint by motion, answer or otherwise. …. While MerchSource has already commenced its investigation of the allegations and issues, additional time is required. The twenty-one (21) day answer period under Fed. R. Civ. P. 12(a)(1)(A)(i) includes the year-end holidays, and relevant MerchSource personnel and its attorneys have various travel, holiday and vacation plans during this time. The proposed extension accounts for the holidays and related travel and vacation plans, and allows for MerchSource's counsel to attend to deadlines and events in other matters already scheduled during January. [].

> MerchSource will be prejudiced and harmed if required to respond to the Complaint without the additional time to more fully analyze the claims and defenses. A proper factual and legal basis is required to prepare and raise certain defenses, objections and responses, but many of these may be waived is not timely asserted. Without the short extension, MerchSource may inadvertently assert, fail to assert, or not fully assert different objections, claims or defenses, all to its prejudice and detriment. In contrast, plaintiff will suffer no harm or prejudice by the short extension. The case has only just been filed, and the extension will not affect any dates in the case, or otherwise delay case activities. [].

SECOND AMENDED COMPLAINT FOR DECLARATORY                                    - 10 -
JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF
CONTRACT

41.     Despite Defendants' representations to DODOCASE that they wanted an extension due to the "potential opportunity for the parties to resolve this dispute without Court intervention," Defendants did not engage in any further discussions regarding resolution until January 12, 2018.

42.     In anticipation of that meeting, Defendants' counsel requested that DODOCASE sign a non-disclosure agreement to allow "MerchSource to provide certain information and documents to DODOcase that are confidential and/or protected by privilege or attorney work product." It became clear during discussions with Defendants' counsel that the "work product" was alleged prior art.

43.     Thus, Defendants sought to (a) use alleged prior art to extort a favorable settlement of this action and a running-royalty license to the DODOCASE Patents while simultaneously (b) shielding said alleged prior art from the public (including their competitors). Counsel for DODOCASE explained that such an agreement would be unethical given DODOCASE's obligations of disclosure to the Patent Office for continuing applications and in future licensing discussions or litigation with third parties. Accordingly, DODOCASE did not execute the non-disclosure agreement that was signed and presented by Defendants.

44.     DODOCASE and Defendants (with counsel and party representatives present) then met for a telephonic conference on Friday, January 12, 2018.

45.     During that conference, the parties discussed potential resolution including renegotiation of the terms of the still-in-force MLA to maintain a running royalty (including options for a running royalty for the life of the DODOCASE Patents).

46.     Unable to reach agreement, Defendants threatened that they were prepared to file challenges to the DODOCASE Patents with the PTAB, though still refusing to provide the alleged prior art upon which they intended to rely. Moreover, citing the scheduled increase in PTAB filing fees, Defendants created an artificial deadline (of Monday, January 15, 2018) for discussions regarding resolution.

47.     After DODOCASE refused to acquiesce to Defendants' attempts to pressure a more favorable royalty rate, and after Defendants threatened to file three PTAB petitions by 3:00 p.m.

Eastern on Monday January 15, 2018, Defendants provided, *for the first time*, identification of three alleged prior art references (discussed below) at 12:54 p.m. Eastern on January 15.

48.     DODOCASE reviewed the alleged prior art in Defendants' artificially-created 2-hour timeframe, promptly determined that Defendants did not have legitimate support for their claims of invalidity, and conveyed its position to Defendants at 3:39 p.m. Eastern on January 15.

49.     At 11:40 p.m. Eastern on January 15, counsel for Defendants provided a web link to their filed PTAB petitions regarding each of the three DODOCASE Patents, which comprised **240 pages** (exclusive of exhibits).

50.     Defendants' representations – regarding their alleged "good cause" for extension of time and risk of prejudice – were false. Defendants did not need the allotted extension to analyze *this* case but, rather, to prepare PTAB petitions.

51.     Defendants' actions (a) delayed this case (leaving the black cloud over the DODOCASE Patents) and will continue to delay pursuing infringement by other third parties (during the lengthy PTAB process and appeal); (b) has forced a parallel litigation track in a second forum (the PTAB) and third forum (the Federal Circuit) despite DODOCASE's efforts to promptly resolve this dispute in a jurisdiction explicitly agreed to in the MLA; and (c) exposed DODOCASE (and now DDC) to increased costs and legal expenses.

52.     Finally, as anticipated, Defendant MerchSource failed to make its payment for Q4 royalties on January 30, 2018 and, despite having received written notice of material anticipatory breach (via email of January 14, 2018), Defendant MerchSource failed to cure its breaches of the MLA (including its payment, marking, and no-challenge obligations) by the February 13, 2018 cure deadline.

53.     As a result, DODOCASE terminated the MLA on February 14, 2018 via written correspondence.

**DEFENDANTS' PTAB PETITIONS**

54.     Defendants filed three PTAB petitions against the DODOCASE Patents: (a) an *inter partes* review ("IPR") against the '075 Patent; (b) a post-grant review ("PGR") against the '117 Patent; and (c) a PGR against the '184 Patent.

55.     Each of these PTAB petitions (and Defendants' invalidity counterclaims by way of reference) rely on the same three "primary references": (1) U.S. Patent Publication No. 2013/0141360, which issued as U.S. Patent No. 9,423,827 ("Compton"); (2) a comment posted on a blog entitled, "Why Google Cardboard is Actually a Huge Boost for Virtual Reality" ("Gigaom"); and (3) a YouTube video entitled, "Use Google Cardboard without Magentometer (Enabling Magnetic Ring Support to Every Device)" ("Tech#").

56.     Compton was part of the Patent Office record for each of the DODOCASE Patents, starting with its consideration during application for the '075 Patent (from which the '117 Patent and '184 Patent are continuations). Nonetheless, the claims of the DODOCASE Patents issued.

57.     The Compton reference does not invalidate any of the DODOCASE Patents under 35 U.S.C. §§ 102 or 103, or any other provision of the Patent Act.

58.     Defendants further rely on Gigaom, a comment posted on a blog (allegedly from June 28, 2014), which reads in its entirety:

> The use of the compass make the use of the compass mode in google street view impossible… Or?
>
> The gyro function is good, but better would be gyro + compass.
>
> The alternative: A metal tape at the separator between the eyes.
>
> It has contact with the touch screen.
>
> If you touch this metal tape (allow, or this small copper tape for Tiffany), is it the same like this "magnet click".
>
> And the compass is full working.
>
> Test it with a wire on every capacitive touch screen.

59. While the Patent Office did not consider this blog comment – as DODOCASE was unaware of its existence until January 15, 2018 – this non-enabling alleged prior art reference (which DODOCASE contends does not constitute a "publication" under the Patent Act) does not invalidate any of the DODOCASE Patents under 35 U.S.C. §§ 102 or 103, or any other provision of the Patent Act.

60. Finally, Defendants' PTAB petitions rely on Tech#, a YouTube video, allegedly posted on *May 10, 2015* – nearly one year after the July 16, 2014 priority date of the DODOCASE Patents and after DODOCASE's own significant disclosures in 2014 (see 35 U.S.C. §102(b)(1)(b)).

61. While the Patent Office did not consider this YouTube video – as DODOCASE was unaware of its existence until January 15, 2018 – this non-enabling alleged prior art reference (which does not constitute prior art under the Patent Act) does not invalidate any of the DODOCASE Patents under 35 U.S.C. §§ 102 or 103, or any other provision of the Patent Act.

62. Moreover, while the Patent Office did not consider the Gigaom or Tech# alleged prior art references, the original '075 Patent provisional application's "Background" section specifically discussed virtual reality viewers that "utilize magnets" (*e.g.*, the Google Cardboard viewer), and the Patent Office considered two Google Cardboard-related references in allowing the '117 Patent and '184 Patent to issue.

63. Specifically, the Patent Office considered a blog post entitled "Google Cardboard DIY Guide," which purported to demonstrate how to modify a Google Cardboard device. (See, http://hacklabtaichung.blogspot.com/2014/07/google-cardboard-diy-guide.html.).

64. Similarly, the Patent Office considered a YouTube video entitled "Adding a Capacitive Lever to a Google Cardboard 1 (On the Cheap)," which purported to demonstrate how to modify a Google Cardboard device. (See, https://www.youtube.com/watch?v=kgJpRtnqQPQ).

65. Defendants have yet to set forth any relevant, non-cumulative prior art sufficient to present a *prima facie* case that the DODOCASE Patents are invalid.

66.     Defendants MerchSource and ThreeSixty have continued to make, sell, offer to sell, and/or import – without payment of the agreed-upon royalty in the MLA (as of October 1, 2017) – the Sharper Image Smartphone 360 Virtual Reality Headset products, which products include an "interactive control button" (aka "capacitive button"). These products are herein referred to as the "Defendant Products."

67.     Generally, the Defendant Products are virtual reality viewers designed to operate with a mobile electronic device having a touch-screen (*e.g.*, "smartphone").

68.     The Defendant Products include two lenses for viewing the mobile electronic device.

69.     The Defendant Products comprise a housing configured to receive and hold the mobile electronic device such that the touch-screen is generally centered in a horizontal direction directly in a user's field of view.

70.     The Defendant Products further include an input mechanism that is accessible on the exterior of the Defendant Products. Defendants call this input mechanism an "interactive control button" or "capacitive button" and state: "Capacitive button allows for convenient one-touch menu selections," and "Press the top button on the VR headset to select objects in your app or video."

71.     The "interactive control button" of the Defendant Products, when in a second (or extended) position, contacts the touchscreen of the mobile electronic device within the virtual reality viewer housing. The "interactive control button" of the Defendant Products comprises a capacitive material to activate the touchscreen of a mobile electronic device.

72.     MerchSource's presently-known Defendant Products "containing the Licensed IP" include: "Virtual Reality Smartphone Viewer"; "Drone DX 14.4inch with Camera HD Streaming with Virtual Reality Smartphone Viewer"; "Drone Lunar 14.4inch with Camera HD with Virtual Reality Smartphone Viewer"; "Virtual Reality Smartphone Viewer with Controller"; "Virtual Reality Smartphone Viewer with Built in Earbuds and Controller"; "Camera 360 Degree View

with Accessories 5pc"; and "Remote Control Italia Racer with Virtual Reality Smartphone Viewer".

73. The Defendant Products further include all substantively similar products (including other virtual reality viewers that comprise an "interactive control button" for use with a touchscreen of a mobile electronic device) and any predecessor and/or successor versions of the foregoing that would otherwise infringe the DODOCASE Patents absent a license.

74. After adequate discovery, DODOCASE may seek leave to amend this Complaint to include additional details of threatened or actual infringement, if any, by other products hereafter discovered to infringe any of the DODOCASE Patents.

## THE MASTER LICENSE AGREEMENT ("MLA")

75. Section 1 of the MLA between DODOCASE and MerchSource provides:

1.1 "Licensed IP" shall mean U.S. Patent No. 9,420,075 issued August 16, 2016, entitled "VIRTUAL REALITY VIEWER AND INPUT MECHANISM" and any continuation or divisional patents thereof.

1.2 "Licensed Product(s)" shall mean those products sold by MerchSource incorporating the inventions claimed and protected by the Licensed IP.

1.3 "Royalty Rate" shall mean the royalty rate of [] percent ([]%) of Net Sales Price.

1.8 "Affiliates" means any officer, director, manager, member, employee, agent of a Party, or any entity controlling or controlled by a Party.

1.9 "Net Sales Price" shall mean 95% of the gross sale price charged by Licensee for the Licensed Product(s).

76. Section 3.1 of the MLA provides: "In consideration for the license granted under this Agreement, MerchSource agrees to pay Licensor the Royalty Rate on all Licensed Products sold by MerchSource or its Affiliates."

77. Section 3.2 of the MLA further provides, in pertinent part: "All royalties calculated as set forth in Section 3.1 shall be paid by MerchSource quarterly within thirty (30) days after the end of each calendar quarter, and shall be accompanied by a written royalty report ("Royalty Report") reflecting the quantities of Licensed Products Sold by MerchSource during each such

quarter, along with all information necessary to calculate the royalties in accordance with the Royalty Rates ….”

78.     Section 3.6 of the MLA further provides: “Upon termination of this Agreement, MerchSource shall have no further obligation to pay any fees to Licensor under this Article 3, except for royalties owed under this Section 3 and for the sale of Licensed Products during the Sell-Off Period, as applicable.”

79.     Section 6.4 of the MLA provides: “MerchSource shall not (a) attempt to challenge the validity or enforceability of the Licensed IP; or (b) directly or indirectly, knowingly assist any Third Party in an attempt to challenge the validity and enforceability of the Licensed IP except to comply with any court order or subpoena.”

80.     Section 8.3 of the MLA further provides: “This Agreement may be terminated by the non-breaching Party in the event that the other Party materially breaches this Agreement and said breach is not cured within thirty (30) [days] of written notice of said breach by the non-breaching Party. If the breaching Party has not corrected the breach within such thirty (30) day period, the non-breaching Party may, at its election, immediately terminate the Agreement.”

81.     Section 8.4 of the MLA provides: “Termination of this Agreement shall cancel any and all rights under the Licensed IP granted to MerchSource pursuant to this Agreement. The following provisions will survive termination of this Agreement: Sections 1 (Definitions), 2 (Payment, for Sales occurred during the Term and Sell-Off Period), 4 (Reports), 7 (Confidentiality), this section 8, and 13 (Miscellaneous).”

82.     Section 8.6 of the MLA provides: “Termination of this Agreement shall not cancel any obligations that may have accrued, nor preclude any remedy for a default which occurred prior to termination.”

83.     Section 8.1.6 of the MLA provides: “Upon termination of any Term Sheet or this Agreement for any reason, MerchSource shall be entitled, for eighteen (18) months (the “Sell-Off Period”) after termination, to continue to sell any Licensed Product, that is the subject of a purchase order, is in transit to a customer or MerchSource, or is in inventory with MerchSource at the time

of termination. Such sales shall be made subject to all the provisions of the Agreement and any respective Term Sheet, including the payment of royalties which shall be due quarterly until the close of the Sell-Off Period."

84. Section 9.1 of the MLA provides: "Licensee agrees to mark all Licensed Products under this Agreement with such patent markings as specified in writing by Licensor and reasonably necessary to protect Licensor's rights under 35 U.S.C. § 287(a)."

85. Section 13.4 of the MLA provides, in pertinent part: "THE PARTIES AGREE … THAT DISPUTES SHALL BE LITIGATED BEFORE THE COURTS IN SAN FRANCISCO COUNTY OR ORANGE COUNTY, CALIFORNIA."

86. Section 13.8 of the MLA provides: "In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable."

87. Section 13.11 of the MLA provides: "In the event litigation or other dispute resolution process is necessary to enforce a provision or provisions of this Agreement, all costs, expenses and attorneys' fees shall be awarded to the prevailing Party."

**COUNT I: BREACHES OF THE MLA BY DEFENDANT MERCHSOURCE**

88. Plaintiffs reallege and incorporate by reference paragraphs 1-87, inclusive, as though fully set forth herein.

89. DODOCASE and MerchSource entered into the MLA on or about October 3, 2016.

90. Defendant ThreeSixty is an Affiliate of MerchSource pursuant to the MLA, as evidenced by its ownership of MerchSource.

91. DODOCASE performed all of its obligations under the MLA. To the extent that Defendants contend that DODOCASE did not perform any obligation under the MLA, Defendants never provided any notice of such failure.

92.     MerchSource breached Section 3.1 of the MLA on January 30, 2018 by failing to "pay Licensor the Royalty Rate on all Licensed Products sold by MerchSource or its Affiliates" for the fourth quarter of 2017.

93.     Upon information and belief, MerchSource also breached Section 3.1 of the MLA by paying less than the full Royalty Rate due for 2017 Q3.

94.     MerchSource further breached Section 3.2 of the MLA on January 30, 2018 by failing to provide the required Royalty Report "reflecting the quantities of Licensed Products Sold by MerchSource during" the quarter ending on December 31, 2017, "along with all information necessary to calculate the royalties in accordance with the Royalty Rates."

95.     MerchSource (in cooperation with its Affiliate, Defendant ThreeSixty) further breached Section 6.4 of the MLA by "challeng[ing] the validity [and] enforceability of the Licensed IP" as evidenced by Defendants' filing of the PTAB petitions on January 15, 2018, after studiously avoiding the public policy considerations set forth in Lear v. Adkins, 395 U.S. 653 (1969).

96.     Rather, Defendants' engaged in vague hand-waiving regarding validity in violation of the MLA while (a) retaining all of the benefits of the MLA, (b) continuing to mark Defendants' Products with the '075 Patent (suggesting to the world that Defendants' Products were superior to those of competitors); and (c) placing a cloud of uncertainty over DODOCASE's intellectual property such that DODOCASE could not pursue additional instances of infringement.

97.     MerchSource further breached Section 9.1 of the MLA by failing to provide assurances that it would "mark all Licensed Products under [the MLA] with such patent markings as specified in writing." Specifically, DODOCASE identified the newly-issued '117 Patent and pending issuance of the '184 Patent via written correspondence on October 17, 2017; DODOCASE then identified the newly-issued '184 Patent via written correspondence on November 2, 2017.

98.     MerchSource (in cooperation with its Affiliate Defendant ThreeSixty) further breached Section 13.4 of the MLA by circumventing the parties' bargained-for forum of "THE

COURTS IN SAN FRANCISCO COUNTY OR ORANGE COUNTY, CALIFORNIA" as evidenced by Defendants' filing of the PTAB petitions outside of the agreed-to forum.

99. DODOCASE anticipated at least some of these breaches by MerchSource during the unproductive discussions on and around January 12, 2018; accordingly, DODOCASE provided written notice of MerchSource's anticipatory breach of at least reporting and payment obligations on January 14, 2018. This notice created a cure deadline of February 13, 2018.

100. MerchSource failed to cure any of its breaches of the MLA on or before February 13, 2018.

101. In accordance with Section 8.3 of the MLA, DODOCASE terminated the MLA on February 14, 2018 via written correspondence.

102. MerchSource's breaches of the MLA (in cooperation with Defendant ThreeSixty), harmed DODOCASE.

103. Specifically, MerchSource's breaches of its reporting and payment obligations under the MLA has harmed DODOCASE financially as a result of the non-payment and/or incomplete payment. MerchSource's breach of the MLA forced DODOCASE to incur extensive expenses to the point that it was compelled to sell its rights to the DODOCASE Patents and the royalty payments under the MLA to DDC. DDC continues to be harmed by MerchSource's non-payment and/or incomplete payment.

104. Moreover, MerchSource's threat to continue selling products without satisfying the patent marking obligations violated the MLA.

105. Further, MerchSource's breaches of the "no-challenge" and "forum selection" provisions resulted in irreparable harm to DODOCASE because it was forced to litigate on a second front that it contracted at arms'-length to avoid (and gave value for such avoidance). (See, e.g., Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., 651 F.3d 1355, 1363-64 (Fed. Cir. 2011)). Specifically, as a result of MerchSource's breach of these provisions, DODOCASE was forced to incur extensive expenses to the point that it was compelled to sell its rights to the DODOCASE

Patents and the royalty payments under the MLA to DDC. DDC continues to incur extensive expenses as a result of MerchSource's breach of these provisions.

106. MerchSource's breaches of the MLA are a substantial factor, if not the only factor, causing DODOCASE's past harm and DDC's continued harm.

107. DDC is entitled to all royalties accrued up until termination of the MLA.

108. Moreover, and at a minimum, DDC is entitled to all royalties accrued on or before January 15, 2018 (even in the unlikely event that the DODOCASE Patents are deemed invalid).

109. Plaintiffs are also entitled to this Court's Order of a preliminary injunction on March 26, 2018 (ECF 52).

110. The preliminary injunction was and remains proper because: (a) DODOCASE suffered and DDC continues to suffer irreparable harm as a result of being required to litigate in a second forum (with limited discovery) that it contracted to avoid (and which may lead to inconsistent results); (b) DDC is highly likely to prevail on the underlying breach of contract claim as set forth in this Count I; (c) Defendants will not be harmed by being required to litigate in the agreed-to forum of this Court – which is evidenced by Defendants filing counterclaims for invalidity in this Court (which can afford all relief requested by Defendants) on February 2, 2018 – while DODOCASE was and DDC continues to be harmed, which on balance favors Plaintiffs; and (d) public policy is furthered by enforcing contract provisions negotiated freely and at arms'-length between sophisticated parties.

111. Finally, DDC is entitled to "all costs, expenses and attorneys' fees" necessarily incurred to remedy MerchSource's breach of the MLA.

**COUNT II: INJUNCTION TO PREVENT THREATENED BREACH OF SURVIVING PROVISIONS OF THE MLA AND/OR INFRINGEMENT OF UNITED STATES PATENT NO. 9,420,075**

112. Plaintiffs reallege and incorporate by reference paragraphs 1-87, inclusive, as though fully set forth herein.

113. DDC is entitled to injunctive relief under § 2201 to prevent continued breach of the MLA (to the extent Defendants intend to rely upon the "Sell-Off Period" provision while refusing

to pay royalties due thereunder) and/or infringement of the '075 Patent pursuant to 35 U.S.C. § 283.

114. Defendants' continued sale and offer for sale of the Defendant Products resulted in further breaches of the MLA and/or the direct infringement of at least independent claim 1 of the '075 Patent.

115. The MLA, negotiated by MerchSource at arms-length, states that "MerchSource desires to manufacture and sell virtual reality viewer products having a capacitive touch input mechanism containing the Licensed IP", and Defendants have never alleged non-infringement of the '075 Patent (as further evidenced by the absence of any counterclaims for non-infringement).

### Claim 1

116. The Defendant Products are virtual reality viewers for use with a mobile electronic device having a touch-screen.

117. The Defendant Products comprise a housing configured to receive the mobile electronic device.

118. Said housing is configured to hold the mobile electronic device such that the touch-screen is generally centered in a horizontal direction and directly in a user's field of view when looking into a generally hollow interior of the housing through a side opposite the touch-screen.

119. The Defendant Products include an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position.

120. Said input mechanism comprises an electrical shield having a surface, wherein only a portion of the surface of the electrical shield is configured to contact a central region of the touch-screen of the mobile electronic device when the input mechanism is in the extended position.

121. Further, the Defendant Products are covered by and infringe dependent claims 2-9 of the '075 Patent.

122.     Defendant MerchSource (and, upon information and belief, Defendant ThreeSixty) received notice of the '075 Patent, and the likelihood of its infringement thereof absent a license, at least as early as June 16, 2016 (the date MerchSource sought a license as described above).

123.     To the extent required by law, DODOCASE and DDC have complied with, and require all licensees to comply with, the provisions of 35 U.S.C. § 287. Moreover, the MLA required that MerchSource mark the Defendant Products with the '075 Patent number.

124.     Defendants' continuing breach of the MLA and/or direct infringement as described above injured DODOCASE and, if not enjoined, will continue to injure DDC as long as such breach and/or infringement occurs.

125.     Based on Defendants' acknowledgement that the Defendant Products incorporate the technologies of at least the '075 Patent, and the unique facts of the past relationship between DODOCASE and MerchSource (as described above), DDC seeks discretionary enhancement of any damages under 35 U.S.C. § 284 prior to an injunction and attorneys' fees and costs under 35 U.S.C. § 285.

126.     There is a substantial threat of irreparable injury from Defendants' continuing breach of the MLA and/or infringement of the '075 Patent (including Defendants' unlawful encumbrance of the property rights granted by the DODOCASE Patents, which encumbrance placed a cloud over DODOCASE's ability, and continues to place a cloud over DDC's ability, to license its patent rights at a fair market value).

127.     Accordingly, Defendants should be enjoined from further breaches of the MLA and/or infringement of the '075 Patent.

**COUNT III: DECLARATORY JUDGMENT AS TO THE VALIDITY AND ENFORCEABILITY OF UNITED STATES PATENT NO. 9,420,075**

128.     Plaintiffs reallege and incorporate by reference paragraphs 1-87, inclusive, as though fully set forth herein.

129.     The '075 Patent was duly issued by the United States Patent Office on August 16, 2016.

SECOND AMENDED COMPLAINT FOR DECLARATORY                                    - 23 -
JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF
CONTRACT

130. The '075 Patent is entitled to the presumption of validity set forth in 35 U.S.C. § 282.

131. On January 15, 2018, Defendants filed an IPR petition challenging the validity of the '075 Patent.

132. On February 2, 2018, Defendants filed counterclaims challenging the validity of the '075 Patent.

133. Accordingly, a present case or controversy exists between the parties and Plaintiffs request a declaration from this Court that the '075 Patent is valid and enforceable.

**COUNT IV: INJUNCTION TO PREVENT THREATENED BREACH OF SURVIVING PROVISIONS OF THE MLA AND/OR INFRINGEMENT OF UNITED STATES PATENT NO. 9,723,117**

134. Plaintiffs reallege and incorporate by reference paragraphs 1-87, inclusive, as though fully set forth herein.

135. DDC is entitled to injunctive relief under § 2201 to prevent continued breach of the MLA (to the extent Defendants intend to rely upon the "Sell-Off Period" provision while refusing to pay royalties due thereunder) and/or infringement of the '117 Patent pursuant to 35 U.S.C. § 283.

136. Defendants' continued sale and offer for sale of the Defendant Products resulted in further breaches of the MLA and/or the direct infringement of at least independent claim 12 of the '117 Patent.

137. The MLA, negotiated by MerchSource at arms-length, states that "MerchSource desires to manufacture and sell virtual reality viewer products having a capacitive touch input mechanism containing the Licensed IP", and Defendants have never alleged non-infringement of the '117 Patent (as further evidenced by the absence of any counterclaims for non-infringement).

**<ins>Claim 12</ins>**

138. The Defendant Products are virtual reality viewers for use with a mobile electronic device having a touch-screen.

139.     The Defendant Products comprise a first lens and a second lens, wherein the first lens is facing the same direction as the second lens, and wherein the first lens and the second lens are spaced apart in a horizontal direction.

140.     The Defendant Products comprise a housing having a back side configured to be held against or in proximity to a user's face and a front side configured to receive the mobile electronic device, the front side of the housing opposite the back side of the housing such that the touchscreen is viewable from the back side of the housing and through the first lens and the second lens.

141.     The Defendant Products include a user input that is accessible from an exterior of the housing and has a first position and a second position.

142.     The Defendant Products include a touchscreen input conductively coupled to the user input and generally centered between the first lens and the second lens in the horizontal direction, wherein, upon receipt of the mobile electronic device, the touchscreen input is in physical contact with the touchscreen when the user input is in the second position.

143.     Further, the Defendant Products are covered by and infringe dependent claims 13-15, 18 and 20 of the '117 Patent.

144.     Defendant MerchSource (and, upon information and belief, ThreeSixty) had notice of the '117 Patent, and the likelihood of its infringement thereof absent a license, at least as early as October 5, 2017 (the date of MerchSource's correspondence regarding invalidity).

145.     To the extent required by law, DODOCASE and DDC have complied with, and require all licensees to comply with, the provisions of 35 U.S.C. § 287. Moreover, the MLA required that MerchSource mark the Defendant Products with the '117 Patent number.

146.     Defendants' continuing breach of the MLA and/or direct infringement as described above, injured DODOCASE and, if not enjoined, will continue to injure DDC as long as such breach and/or infringement occurs.

147.     Based on Defendants' acknowledgement that the Defendant Products incorporate the technologies of at least the '075 Patent (to which the '117 Patent claims priority), and the

unique facts of the past relationship between DODOCASE and MerchSource (as described above), DDC seeks discretionary enhancement of any damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

148.   There is a substantial threat of irreparable injury from Defendants' continuing breach of the MLA and/or infringement of the '117 Patent (including Defendants' unlawful encumbrance of the property rights granted by the DODOCASE Patents, which encumbrance placed a cloud over DODOCASE's ability, and continues to place a cloud over DDC's ability, to license its patent rights at a fair market value).

149.   Accordingly, Defendants should be enjoined from further breaches of the MLA and/or infringement of the '117 Patent.

### COUNT V: DECLARATORY JUDGMENT AS TO THE VALIDITY AND ENFORCEABILITY OF UNITED STATES PATENT NO. 9,723,117

150.   Plaintiffs reallege and incorporate by reference paragraphs 1-87, inclusive, as though fully set forth herein.

151.   The '117 Patent was duly issued by the United States Patent Office on August 1, 2017.

152.   The '117 Patent is entitled to the presumption of validity set forth in 35 U.S.C. § 282.

153.   On January 15, 2018, Defendants filed an IPR petition challenging the validity of the '117 Patent.

154.   On February 2, 2018, Defendants filed counterclaims challenging the validity of the '117 Patent.

155.   Accordingly, a present case or controversy exists between the parties and Plaintiffs request a declaration from this Court that the '117 Patent is valid and enforceable.

**COUNT VI: INJUNCTION TO PREVENT THREATENED BREACH OF SURVIVING
PROVISIONS OF THE MLA
AND/OR INFRINGEMENT OF UNITED STATES PATENT NO. 9,811,184**

156.    Plaintiffs reallege and incorporate by reference paragraphs 1-87, inclusive, as though fully set forth herein.

157.    DDC is entitled to injunctive relief under § 2201 to prevent continued breach of the MLA (to the extent Defendants intend to rely upon the "Sell-Off Period" provision while refusing to pay royalties due thereunder) and/or infringement of the '184 Patent pursuant to 35 U.S.C. § 283.

158.    Defendants' continued sale and offer for sale of the Defendant Products resulted in further breaches of the MLA and/or the direct infringement of at least independent claim 12 of the '184 Patent.

159.    The MLA, negotiated by MerchSource at arms-length, states that "MerchSource desires to manufacture and sell virtual reality viewer products having a capacitive touch input mechanism containing the Licensed IP", and Defendants have never alleged non-infringement of the '184 Patent (as further evidenced by the absence of any counterclaims for non-infringement).

### Claim 12

160.    The Defendant Products are virtual reality viewers for use with a mobile electronic device having a touch-screen.

161.    The Defendant Products comprise a first lens and a second lens, wherein the first lens is facing the same direction as the second lens, and wherein the first lens and the second lens are spaced apart in a horizontal direction.

162.    The Defendant Products comprise an enclosure having a first side and a second side opposite the first side, the first side configured to hold the first lens and the second lens, the second side configured to receive the mobile electronic device.

163.    The Defendant Products include a user input that is accessible from an exterior of the enclosure and has a first position and a second position.

SECOND AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF
CONTRACT

164. The Defendant Products include a touchscreen input conductively coupled to the user input and generally centered between the first lens and the second lens in the horizontal direction, wherein, upon receipt of the mobile electronic device, the touchscreen input is in physical contact with the touchscreen when the user input is in the second position.

165. Further, the Defendant Products are covered by and infringe dependent claims 15-18 and 20 of the '184 Patent.

166. Defendant MerchSource (and, upon information and belief, ThreeSixty) had notice of the '184 Patent, and the likelihood of its infringement thereof, as of its issuance on November 7, 2017 (as evidenced by MerchSource's October 5, 2017 acknowledgement of the application that resulted in the '184 Patent).

167. To the extent required by law, DODOCASE and DDC have complied with, and require all licensees to comply with, the provisions of 35 U.S.C. § 287. Moreover, the MLA required that MerchSource mark the Defendant Products with the '184 Patent number.

168. Defendants' continuing breach of the MLA and/or direct infringement as described above injured DODOCASE and, if not enjoined, will continue to injure DDC as long as such breach and/or infringement occurs.

169. Based on Defendants' acknowledgement that the Defendant Products incorporate the technologies of at least the '075 Patent (to which the '184 Patent claims priority), and the unique facts of the past relationship between DODOCASE and MerchSource (as described above), DDC seeks discretionary enhancement of any damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

170. There is a substantial threat of irreparable injury from Defendants' continuing breach of the MLA and/or infringement of the '184 Patent (including Defendants' unlawful encumbrance of the property rights granted by the DODOCASE Patents, which encumbrance placed a cloud over DODOCASE's ability, and continues to place a cloud over DDC's ability, to license its patent rights at a fair market value).

171.    Accordingly, Defendants should be enjoined from breaches of the MLA and/or infringement of the '184 Patent.

## COUNT VII: DECLARATORY JUDGMENT AS TO THE VALIDITY AND ENFORCEABILITY OF UNITED STATES PATENT NO. 9,811,184

172.    Plaintiffs reallege and incorporate by reference paragraphs 1-87, inclusive, as though fully set forth herein.

173.    The '184 Patent was duly issued by the United States Patent Office on November 7, 2017.

174.    The '184 Patent is entitled to the presumption of validity set forth in 35 U.S.C. § 282.

175.    On January 15, 2018, Defendants filed an IPR petition challenging the validity of the '184 Patent.

176.    On February 2, 2018, Defendants filed counterclaims challenging the validity of the '184 Patent.

177.    Accordingly, a present case or controversy exists between the parties and Plaintiffs requests a declaration from this Court that the '184 Patent is valid and enforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs DDC Technology, LLC and DODOCASE VR, Inc. respectfully request this Court to enter judgment against Defendants MerchSource, LLC and ThreeSixty Brands Group LLC, jointly and severally – and against each of their subsidiaries, predecessors, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with them – granting the following relief:

A.    A temporary restraining order or preliminary injunction Ordering Defendants to withdraw their PTAB petitions;

B.    The entry of declaratory judgment in favor of Plaintiffs and against Defendants that the DODOCASE Patents are valid and enforceable as provided by 35 U.S.C. § 282;

C. Injunctive relief preventing any continued breaches of the MLA (to the extent Defendants intend to rely upon the "Sell-Off Period" provision while refusing to pay royalties due thereunder) and/or infringement of the DODOCASE Patents, and preventing further irreparable injury to Plaintiffs as provided by 35 U.S.C. § 283, particularly in view of the competitive relationship of the parties;

D. An award of damages against Defendants adequate to compensate Plaintiffs for any infringement that may have occurred or will occur in the future, but in no event less than a reasonable royalty as permitted by 35 U.S.C. § 284, together with prejudgment interest from the date the infringement began;

E. A finding that Defendant MerchSource breached the MLA;

F. An award of damages for breach of the MLA, but in no event less than the royalties accrued from Defendants' sale of Licensed Products through January 15, 2018 (the date on which Defendants first identified alleged prior art and formally challenged the DODOCASE Patents by filing their PTAB petitions);

G. An award of any damages resulting from MerchSource's underpayment of previous royalties, to the extent applicable;

H. A finding that this case is exceptional based at least on Defendants' conduct and an award to Plaintiffs of their reasonable attorneys' fees and costs as provided by 35 U.S.C. § 285;

I. A finding that Defendant MerchSource is liable for attorneys' fees and costs pursuant to the MLA;

J. An accounting of all costs associated with the filing and maintenance of this action incurred by Plaintiffs; and

K. Such other relief to which Plaintiffs are entitled under the law and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

SECOND AMENDED COMPLAINT FOR DECLARATORY     - 30 -
JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF
CONTRACT

January 7, 2019

Respectfully submitted,

/s/Timothy J. Haller
HALLER LAW PLLC
Timothy J. Haller (*Admitted Pro Hac Vice*)
haller@haller-iplaw.com

NOBLE IP LLC
Gabriel I. Opatken (*Admitted Pro Hac Vice*)
gabriel@nobleipllc.com

LAW OFFICES OF MARC LIBARLE
Marc Libarle (*State Bar No. 071678*)
ml7006@gmail.com

*Attorneys for Plaintiffs DDC Technology, LLC
and DODOCASE VR, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document is being served on January 7, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per L.R. 5-1(h)(1).

/s/Timothy J. Haller

Timothy J. Haller

# EXHIBIT A

## TO

# SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF CONTRACT


US009420075B2

(12) **United States Patent**  (10) **Patent No.:** **US 9,420,075 B2**

Buckley  (45) **Date of Patent:** **Aug. 16, 2016**

(54) **VIRTUAL REALITY VIEWER AND INPUT MECHANISM**

(71) Applicant: **DODOcase, Inc.**, San Francisco, CA (US)

(72) Inventor: **Patrick Buckley**, San Francisco, CA (US)

(73) Assignee: **DODOcase, Inc.**, San Francisco, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/801,606**

(22) Filed: **Jul. 16, 2015**

(65) **Prior Publication Data**

US 2016/0018853 A1     Jan. 21, 2016

**Related U.S. Application Data**

(60) Provisional application No. 62/025,376, filed on Jul. 16, 2014, provisional application No. 62/161,857, filed on May 14, 2015.

(51) **Int. Cl.**
| | |
|---|---|
| *G02B 27/01* | (2006.01) |
| *H04M 1/04* | (2006.01) |
| *G06F 3/044* | (2006.01) |
| *G06T 19/00* | (2011.01) |
| *H04M 1/02* | (2006.01) |
| *H04M 1/21* | (2006.01) |
| *G06F 1/16* | (2006.01) |
| *G06F 3/01* | (2006.01) |
| *G06F 3/041* | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *H04M 1/04* (2013.01); *G02B 27/0176*

(2013.01); *G06F 1/163* (2013.01); *G06F 3/011* (2013.01); *G06F 3/041* (2013.01); *G06F 3/044* (2013.01); *G06T 19/006* (2013.01); *H04M 1/0266* (2013.01); *H04M 1/21* (2013.01); *G02B 2027/0178* (2013.01)

(58) **Field of Classification Search**
CPC .................................. G02B 27/01–2027/0198
USPC ........................................................ 345/7–9
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2013/0141360 A1*  6/2013  Compton .............. G06F 1/1632
345/173

* cited by examiner

*Primary Examiner* — Michael Pervan

(74) *Attorney, Agent, or Firm* — Leason Ellis LLP

(57) **ABSTRACT**

The present invention concerns virtual reality viewers for use with touchscreen enabled mobile devices. The virtual reality viewer comprises: a housing configured to receive a mobile electronic device within an interior of the housing; and an input mechanism that is accessible from an exterior of the housing and that is moveable within the interior between a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position. The disclosed systems and methods facilitate receiving user inputs on the exterior of the housing and providing the user inputs to the touchscreen within the housing using the electro-mechanical input mechanism. Accordingly, the viewer can be used with a variety of smartphones without requiring magnetic switches or a wireless/cable connection between the input device and the smartphone.

**20 Claims, 10 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6A



FIG. 6B



FIG. 7A



FIG. 7B



FIG. 7C



FIG. 7D



700

725

710

712

715

FIG. 7E



FIG. 7F

1

# VIRTUAL REALITY VIEWER AND INPUT MECHANISM

## CROSS REFERENCE TO RELATED APPLICATIONS

The present application is related to and includes U.S. Provisional Patent Application Ser. No. 62/025,376 titled "SYSTEM AND METHOD FOR VR HEADSET USER INTERACTION" filed on Jul. 16, 2014 and listing inventors Patrick Regan Buckley, Craig Dalton and Gene Daly; and U.S. Provisional Patent Application Ser. No. 62/161,857, titled "SYSTEM AND METHOD FOR VIRTUAL REAL-ITY HEADSET USER INTERACTION THROUGH ELEC-TROMECHANICAL DEVICE AND TOUCHSCREEN," filed on May 14, 2015 and listing inventors Patrick Regan Buckley, Craig Dalton and Gene Daly, which are each hereby incorporated by reference as if set forth in their respective entireties herein.

## TECHNICAL FIELD OF THE INVENTION

The present invention relates to virtual reality viewer devices, in particular, virtual reality viewer devices for use with personal mobile electronic devices and having an input device.

## BACKGROUND OF THE INVENTION

Virtual reality viewers and headsets (collectively referred to as viewers) are becoming an increasingly popular way of viewing digital media, gaming and the like. With the wide-spread distribution of powerful and capable smartphone devices, many VR viewers are designed to use such smart-phone devices as the visual display device, instead of having dedicated displays and electronics.

Typically the viewers have a housing that a user looks into in order to view the video display device contained within the housing. Viewers can be hand-held devices that a user holds up to the users face/eyes, for example, like a user would hold a pair of binoculars. Viewers can also be worn on a user's head, so as to free the users hands while looking into the viewer.

As would be understood by those in the art, viewers con-figured to use a smartphone as the visual display device typically receive the smartphone such that the smart phone display is viewable when a user looks into the viewer housing. These viewers also typically include one or more optical lenses within the housing so as to facilitate a three-dimen-sional viewing experience despite the two-dimensional dis-play of the smartphone. In some instances the smartphone is completely contained within the housing, in other implemen-tations the smartphone is attached to the housing in a manner such that the display is exposed within the interior of the viewer

One challenge to utilizing a smartphone in these types of viewers is that the touch sensitive display is concealed within the viewer housing, thereby making it difficult for a user to interact with the touch sensitive display of the device. To overcome this, some existing VR viewers utilize magnets on the exterior of the viewer as input devices, however one drawback is that the locations of magnetic sensors on smart-phones vary from device to device and, as such, these viewers with magnetic inputs are only effectively used with a limited number of devices. Other VR viewers utilize built in acceler-ometers or other such position/orientation sensors within the smartphone to detect movement or the absence of movement

2

and identify user inputs using the movement data. Other VR viewers utilize dedicated input devices, like video game con-trollers, that connect to the electronic device within the viewer either by a wired plug like connection (e.g., USB or Apple compatible connector), or a wireless connection capa-bilities. However, such VR viewer configurations typically require complex electronic circuitry and wireless connectiv-ity capabilities in order to facilitate the capture and transfer of user inputs. Moreover, dedicated input controllers can be cumbersome when used with hand-held viewer.

What is needed is a VR viewer having integrated user input devices that is configured for use with a wide variety of conventionally available smartphone devices.

These considerations are addressed by the present inven-tion.

## SUMMARY OF THE INVENTION

The present invention concerns a virtual reality viewer including an input mechanism that can be used with mobile electronic device having a touchscreen contained within the viewer. According to a first aspect, the virtual reality viewer for use with a mobile electronic device having a touch-screen, comprises: a housing configured to receive a mobile elec-tronic device within an interior of the housing. In addition, the viewer further comprises an input mechanism that is acces-sible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, wherein a surface of the input mechanism is config-ured to contact the touch-screen of the mobile electronic device when in the extended position.

According to another aspect, the virtual reality viewer for use with a mobile electronic device having a touch-screen, comprises: a housing configured to receive a mobile elec-tronic device within an interior of the housing; and an input device including a first portion that is accessible from an exterior of the housing, and a surface within the interior that is configured to contact the touch-screen of the mobile elec-tronic device and transfer a capacitive touch input to the touch-screen in response to a user interaction with the first portion.

These and other aspects, features, steps and advantages can be further appreciated from the accompanying figures and description of certain illustrative embodiments.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1, illustrates an exemplary virtual reality viewer;
FIG. 2, illustrates the viewer of FIG. 1;
FIG. 3, illustrates the viewer of FIG. 1;
FIG. 4, illustrates an exemplary virtual reality viewer;
FIG. 5, illustrates an exemplary virtual reality viewer;
FIG. 6A, illustrates an exemplary virtual reality viewer including an input mechanism in accordance with an embodi-ment of the invention;
FIG. 6B, illustrates the viewer of FIG. 6A;
FIG. 7A, illustrates an exemplary input mechanism for a virtual reality viewer in accordance with an embodiment of the invention;
FIG. 7B, illustrates the exemplary input mechanism for a virtual reality viewer of FIG. 7A;
FIG. 7C, illustrates a virtual reality viewer including the input mechanism of FIG. 7A;
FIG. 7D, illustrates the exemplary viewer and input mecha-nism of FIG. 7C;
FIG. 7E, illustrates the exemplary viewer and input mecha-nism of FIG. 7C; and

FIG. 7F, illustrates the exemplary viewer and input mechanism of FIG. 7C.

## DETAILED DESCRIPTION OF THE INVENTION

According to an aspect of the subject application, Virtual reality viewer systems and methods are provided that facilitate the capture of user inputs while using the virtual reality viewer. More specifically, the disclosed systems and methods provide a virtual reality viewer for use with a wide variety of personal electronic devices (e.g., a smartphone) as the visual display device, and having improved tactile user input capabilities.

According to a salient aspect, the disclosed systems and methods facilitate receiving tactile user inputs (e.g., user touches, button depressions etc.) on the exterior of the housing of the viewer and providing the user inputs to the touch sensitive display of the smartphone that is within the viewer housing. In this manner, the disclosed systems and methods provide a viewer that is configured to be useable with a wide variety of smartphones without requiring input devices that require specifically placed magnetic sensors, wireless or dedicated cable connection to the electronic device 15.

In one arrangement, the viewer is provided having a housing that encloses a generally hollow interior. As shown in FIG. 1, which is a perspective view of an exemplary viewer 10 having a conventional construction without an input mechanism. As shown, the viewer comprises a housing 12 that includes a front surface 30, back surface 25, top surface 45, bottom surface 50 (not shown), left surface 40 and right surface 35.

In some implementations, when in operation, housing 12 will be disposed in the position directly in front of the user's eyes such that the lenses contained in the housing, are in alignment with each of the user's eyes and the display of the electronic device is viewable through the lenses. It should be understood that the housing can be held by the user, or worn by the user such that the back surface of the housing is held against or in proximity to the users face.

The housing 12 is configured to receive an electronic device 15 having a touch sensitive display. The electronic device 15 can be any electronic device configured to visually display information via a display (e.g., LED, Plasma, LCD display) and receive user inputs via a touch sensitive user interface (e.g., a capacitive touch sensitive display), as would be understood by those skilled in the art. For example and without limitation, electronic device 15 can include a smartphone or other such personal electronic device having a touch sensitive display, for example, an iPhone or Android smartphone device and the like that are commercially available.

Preferably the electronic device 15 is received or mounted within the interior of the housing 12 such that the electronic device display 17 is viewable when the user is looking through the housing 12. By way of further example, the electronic device 15, can be mounted on the housing such that it defines the back surface of the viewer. It can be appreciated that other configurations for the viewer 10 are envisioned without departing from the scope of the invention.

As shown in FIG. 2, which is a back view of the viewer (the terminology back side of refers to the side that the user looks into), preferably the housing 12 is configured to receive the electronic device 15 such that the touch sensitive display 17 of the device 15 is centered in a vertical direction 80 and/or a horizontal direction 85.

As shown in FIGS. 1 and 2, in some implementations, the housing includes one or more lenses 70 disposed therein

arranged to be in alignment with the user's eyes when the user looks into the viewer. Generally, lenses 70 are mounted such that light from the display of the electronic device passes through lenses 70 to the user's eyes. The configuration, construction and placement of a lens or lenses 70 for use in virtual reality viewers are generally known and understood by those skilled in the art.

A view divider 20 can also be disposed within the housing. FIG. 4 is a perspective view of an exemplary configuration of a viewer 10 without a top, bottom and sides and showing the interior space of the viewer including the view divider 20. FIG. 5 shows a bottom view of the interior of an exemplary viewer 10 including view divider 20 and having the left and right, bottom and front sides removed. Referring to FIG. 5, the view divider 20 is configured to isolate the field of view of the left eye from the right eye. In other words, the view divider serves to obstruct the right eye from seeing or receiving images displayed by the left portion 19 of the display 17 of the electronic device 15 and the left eye from seeing images displayed by the right portion 18 of the display 17. It should also be appreciated that the particular width of the left and right portions of the display that are actually viewable by the user can vary depending on the lenses. In some implementations view dividers are not used.

Between the left and right portion of the display 17 is a central portion 14 of the display. The central portion of the display is not viewable by either the left or right eye due to the view divider 20, and, in addition or alternatively, due to the optical characteristics of the lenses 70. The width of the central portion 14 can range from the width of the view divider 20 but can be larger depending on the optical characteristics of the lenses 70. The central portion 14 that is not viewable by either the left or right eye can also vary in shape depending on the optical characteristics of the lenses. For example it might be rectangular or an hour glass shape that is wider towards the top and bottom sides of the viewer and narrower in the middle section of the display 17.

In one arrangement, the viewer 10 is configured to include one or more input devices that are configured to receive user inputs at the exterior of the viewer and provide such inputs directly to the touch sensitive display 17. The input devices can be configured to be passive and/or active input devices.

Preferably the inputs are provided to the display at the central portion 14 of the display, however one or more of the user inputs can be provided to the electronic device at alternative portions of the display 17 as well. Because the central portion 14 of the display is not viewable by the left or right eye to, by providing inputs at the central portion 14, the viewer 10 is capable of providing inputs to the electronic device 15 in a manner that does not disturb the field of view of the left or right eye. Moreover, because the device 15 is received within the housing and preferably positioned such that the display 17 portion of the device is generally centered in at least a horizontal direction and often in vertical direction as well, providing inputs in the central portion 14, for example, where the view divider 20 is proximate to the display 17, allows the systems and methods disclosed herein to be useable with a wide variety of touch sensitive smartphone devices of various sizes and screen layouts. Moreover software can be configured universally to these touch points regardless of the shape or size of the device because of the centered location.

An exemplary implementation of a viewer including an input mechanism in accordance with an embodiment of the invention is shown in FIG. 6A-6B, which depict a cross-sectional view and of the exemplary viewer 10, including the view divider 20 and the electronic device 15 from the side and back perspective respectively. As shown, the viewer includes

5

input devices that include one or more touchscreen inputs (26a-26d). In this particular exemplary configuration, the touchscreen inputs (26a-26d) are disposed on the distal surface 22 of the view divider 20. Preferably, the electronic device 15 is mounted in a manner such that the touch sensitive display 17 of the device 15, is proximate to (or is touching) at least a portion of the distal surface 22 of the view divider 20, such that the display 17 (not shown from this particular perspective) of the device is in physical contact with the surface of the touchscreen input portion of the input mechanism.

As most smartphones have capacitive touch sensitive displays, in an exemplary implementation, the touchscreen inputs (26a-26d) are constructed from a conductive material, for example, a conductive foam or polymer and the like as are used as the tip of a stylus configured for use with a capacitive touch screen. A compressible material will allow the housing to accommodate devices of varying thicknesses and create a capacitive connection between the display and the touchscreen inputs without the screen touching other portions of the surface 22, for example, to prevent scratching of the screen, provide communicative connection between touchscreen input and the touchscreen without cross-talk and other such considerations.

Preferably, the touchscreen inputs (26a-26d) are electrically coupled to one or more user inputs (29a-29d) that are configured to receive user interactions while using the viewer. Preferably the user inputs (29a-29d) are exposed on the outer surfaces of the housing or positioned on the exterior of the housing 12 such that the user can interact with the user inputs (29a-29d) while using the viewer 10, although other configurations are envisioned without departing from the scope of the invention. The user inputs are configured to sense/detect or receive the user interactions and transmit/transfer/relay the user interaction to the touch sensitive display via the touch screen inputs (26a-26d). In some implementations, the user inputs relay the user interactions to the touch screen inputs (26a-26d) via input leads (28a-28d), respectively. For example and without limitation, input leads can be conductive wires/leads that electrically couple the user inputs (29a-29d) to touchscreen inputs (26a-26d).

In such an exemplary configuration in which the input device is a passive input device, the user inputs (e.g., 29a-29d) are preferably constructed of conductive material, for example, a metalized polymer, conductive polymers, conductive/capacitive inks, carbon based inks or other such inks designed to activate capacitive screens. Accordingly, a user touch of a conductive user input (e.g., 29a), via the conductive lead (e.g., 28a) and touchscreen input (e.g., 26a), will alter the electrical properties of the portion of the display 17 that is in contact with the touchscreen input.

As will be understood by those skilled in the art, the device 15 having a capacitive touch sensitive display 17 can detect the particular location of a change in the electrical property that is caused by the user touch of the user input (e.g., 29a). As would be understood by those skilled in the art, based on the particular location of the sensed change, the device 15, which has a processor executing instructions in the form of code, can interpret that an electrical change sensed at a particular location on the display 17 corresponds to a user interaction with a particular user input and corresponds to a prescribed input instruction, for example, a left mouse click or a right mouse click, or a double click, or as the user moving a cursor, or other such functions. Moreover, it would be understood that other combinations of user interactions sensed by the touch sensitive display can be interpreted as one or more of a number of user inputs such as pushing all 4 buttons at once could represent grabbing a virtual item. The 3 dimensional physical

6

interaction offered by the users hands wrapping around the virtual reality viewer and interacting with the inputs can more easily be translated into 3 dimensional virtual interactions in a more natural way then previous user input mechanisms used today. It should also be understood that the arrangement of the touchscreen inputs the corresponding user inputs and associated functions can be pre-defined in software that is loaded into and executing in the device 15 processor.

Although an exemplary passive input device configuration having 4 distinct user inputs has been disclosed, it can be appreciated that other passive input device configurations are envisioned. For example an array of user inputs and corresponding touchscreen inputs can be provided. It should also be understood that other active input device configurations can also be implemented in accordance with the disclosed embodiments without departing from the scope of the invention.

Although FIG. 6A shows the user inputs positioned on the top and bottom surfaces of the housing 12 and also shows that the leads run through the view divider 20 and through the top and bottom surfaces of the housing to corresponding user inputs, it can be appreciated that the leads can run through any portions of the housing. It can be further appreciated that any number of the user inputs (29a-29d) can be located on any portion of the housing and in any orientation or configuration. Moreover, it can be further appreciated that any number of touchscreen inputs (e.g., 26a-26d) can be located on the distal end 22 and in any orientation or configuration.

Moreover, although the exemplary configuration provides the user inputs to the screen 17 at the central portion 14 of the display 17 via the view divider 20, other configurations are possible. For example, the viewer can provide such touchscreen inputs (e.g., 26a-26d) on a surface that abuts one or more other portions the display 17.

In accordance with the disclosed embodiments of the invention, the exemplary viewers can be configured to allow the user to mechanically induce an electrical/capacitive touch event on the touchscreen. Further to the foregoing exemplary embodiments of the invention, additional exemplary configurations of a viewer having an input mechanism, which is also referred to as the user input assembly, configured to induce a capacitive touch event that is detectable by a touchscreen based on mutual-capacitance are further described herein. It can be appreciated that the exemplary implementation described herein can be adapted to mechanically induce input events on a variety of types of touchscreens (e.g., resistive touchscreen events, touch events). Additional exemplary configurations of the viewer in accordance with the disclosed embodiments of the invention are further described herein in relation to FIGS. 7A-7F.

FIG. 7C depicts a perspective view of a viewer 700 assembled and having a front side open showing the generally hollow interior of the viewer. Also shown is an input mechanism 715. The input mechanism is disposed within the interior 702 of the housing of the viewer 700. Moreover, at least a portion of the input mechanism is also accessible from the exterior of the viewer such that a user can interact with the input mechanism and cause the portion of the input mechanism contained within the housing to generate a touch input on the touch interface. More specifically, the input mechanism is moveable within the interior between at least a first position (also referred to as an unactuated state), in which a portion of the input mechanism is retracted so as to not contact a touchscreen of the mobile device, and an extended position (also referred to as the actuated state) in which a surface of the input mechanism contacts the touch-screen of the mobile electronic. As shown, at least a portion of the input

mechanism is centrally located within the housing and defines at least a portion of a view divider **710**. It should be appreciated that the housing and or one or more portions of the input mechanism further described herein can be comprised of a variety of materials such as plastics, metals, composites, woods and other heavy paper-like materials (e.g., cardboard) and or other such natural and synthetic materials.

FIG. **7**A depicts the view divider **710** with one side of the view divider folded back so as to expose a portion of the user input mechanism **715** disposed within the interior of the viewer **700**. The diagram also shows the user input mechanism **715** in an unactuated state.

As shown, FIG. **7**A depicts a distal end **720** of a user input portion of the user input mechanism, which in this exemplary implementation is a lever. The proximal end (not shown) of the lever is accessible to a user from outside the viewer when assembled. The diagram depicts the input assembly **715** in an un-actuated state. Also shown is an electrical shield **725**. The electric shield is arranged such that at least a portion of the electric shield is configured to contact the touch-screen of the mobile electronic device when the input mechanism is in the extended position. The electrical shield is a material configured to, when brought in proximity to and/or touches the touchscreen, induce a touch event that is electrically detectable by the touchscreen/device. In some implementations the electrical shield material can be a metallized textile/fabric or films, e.g., polymer film coated with a thin layer of metal, for example PET (Polyethylene terephthalate) films and Mylar (BoPET Biaxially-oriented polyethylene terephthalate). Such metalized materials are commonly used in anti-static bags. Moreover, the electrical shield can be comprised of other metallic conductors, non-metallic conductors, metallized fabrics, metallized polymers, conductive polymers, conductive fabrics, flexographic inks, rigid flex printed circuit board (PCB) and the like. As would be understood by those skilled in the art, such materials have electrical properties that, when a surface of the material is brought in proximity to a touchscreen and/or touches a touchscreen, can affect the electrical properties detected at that location by the touchscreen device. Other materials having the requisite electrical properties can also be used, for example, inks or pastes with carbon such as black flexographic inks having capacitive touch properties that are printed on substrates. Moreover, it can be appreciated that a combination of materials can be used to provide a surface of the input mechanism that is configured to induce a detectable touch input when the surface is touched to the touchscreen. For example the electric shield can include a conductive polymer arranged to selectively contact the touchscreen and that is electrically coupled to a metallized fabric or conductive ink applied to a surface of the housing and/or input mechanism.

In some implementations, the electric shield is configured (e.g., sized and/or positioned) so as to have capacitive properties sufficient to be detected by a capacitive touch-screen when the input mechanism is in the extended position and in the absence of human contact with the electric shield. However, it can also be appreciated that, in some implementations, the electric shield can be electrically coupled to the portion of the input mechanism that is interacted with by the user such that electrical properties of the user's body can be utilized to induce the touch input.

Also shown is a coupling **730** that is configured to move the input mechanism towards the touchscreen when the lever is actuated. The coupling is a linkage that couples the portion of the input mechanism that is accessible to the user from the exterior (e.g., the proximal end of the lever) to the surface of the input mechanism configured to touch the touchscreen and

induce a touch input. The coupling mechanically translates user actuation of the portion of the input mechanism from the exterior of the housing into movement of the input mechanism within the interior of the housing and causing a surface of the input mechanism to touch the touchscreen. For example, in the particular implementation shown in FIGS. **7**A-**7**F, actuation of the lever causes the coupling to deform and extend in a direction towards the touchscreen, which in turn moves a portion of the electrical shield towards the touchscreen. Furthermore, as shown in FIG. **7**A, the coupling can be coupled to the housing. As can be appreciated, coupling one or more portions of the input mechanism to the housing can serve to support the input mechanism as well as guide the movement of the input mechanism during user actuation.

The coupling can be comprised of one or more flexible materials such as plastics, metals, composites, woods and other heavy paper-like materials (e.g., cardboard) and or other such natural and synthetic materials. A linkage or coupling that is flexible can be beneficial in that the material memory causes the coupling to return to a resting state when pressure is released from the lever which automatically pulls the input mechanism away from the touchscreen. However, alternative methods for automatically retracting the contact surface of the input mechanism can be similarly implemented without departing from the scope of the invention.

Although a particular exemplary linkage configuration is described in relation to FIGS. **7**A-**7**F, it can be appreciated that other linkage configurations can be implemented without departing from the scope of the invention. It can also be appreciated that, although the lever, coupling and metallic shield have been described as individual components, the subject invention is not so limited as one or more of the foregoing components can be joined or integrally formed as single unit. Similarly, it can also be appreciated that one or more of the components of the input mechanism can be joined to the housing or integrally formed with the housing in a permanent or temporary fashion using any conventional manufacturing techniques.

In some implementations, a compressible pad **735**, for example, a foam or foam-like material can be disposed between the flexible coupling and the electric shield. The pad can be placed between the flexible coupling and the electrical shield **725** in at least the location where the coupling contacts the metallic shield when extended (e.g., the back side of the electrical shield where the front side of the shield material contacts the touchscreen when extended). It can be appreciated that the electrical shield can be attached to the foam material or unattached. It can also be appreciated that the pad can be coupled to the coupling either directly or indirectly by one or more intermediate structures that comprise the input mechanism. The pad is used to create a sufficiently sized contact surface between the front side of the shield material and the touchscreen so as to register a touch input event on the screen (e.g., to simulate the size and shape of a finger). The pad also helps the surface of the input mechanism configured to touch the touchscreen (i.e., the shield material) conform to the touchscreen surface when the input mechanism is in the extended position/actuated state.

It can be appreciated that various sizes and shapes of the pad can be used to induce an sufficient sized contact surface. It can also be appreciated that in some implementations the pad can be omitted. It can also be appreciated that the metallic shield and pad may be integrated or combined into a single material such as conductive foam gaskets used in Electromagnetic Interference (EMI) or Radio Frequency Interference (RFI) applications. It can also be appreciated that the pad

can be sized and/or shaped such that actuating the input mechanism with greater force causes a greater surface area of the electrical shield to be applied to the screen which can be interpreted differently by the device than when a smaller surface area is detected by the touchscreen. This input mechanism configuration can be used to provide a secondary signal for detecting the amplitude of the users input, for example a method for detecting the amount of force the user applied to the input.

A portion of the lever can be attached to or in communication with (i.e., touching) or integrally formed to at least a portion of the coupling. For instance, as shown, the distal end of the lever can be abutting a portion of the coupling such that, when the lever is actuated at a proximal end, movement of the distal end of the lever causes the plastic coupling to buckle and at least a portion of the coupling extends in the direction towards the touchscreen. In addition or alternatively the coupling can be a structure that is flexibly coupled to one or more portions of the housing such that it moves in a prescribed manner when a lever is moved or a button is pushed by the user.

FIG. 7A depicts the view divider **710** with one side of the view divider folded back so as to expose the user input assembly **715** disposed within the view divider of the viewer **700**. The diagram also shows the user input assembly **715** in an unactuated state.

FIG. 7B depicts the view divider **710** with one side of the view divider folded back so as to expose the user input assembly **715** disposed within the view divider of the viewer **700**. The diagram also shows the user input assembly **715** in an actuated state.

FIG. 7C depicts a perspective view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the housing **700**. The diagram also shows the user input assembly **715** in an un-actuated state. As shown, the user input (lever) includes a proximal end portion **722** that extends through a cut-out in the housing of the viewer **700** and is accordingly accessible to the user from the exterior of the housing. It can be appreciated that alternative configurations in which one or more portions of the lever or other such mechanical actuators or portions of the input mechanism is accessible from the exterior of the viewer are envisioned. For instance the lever can be contained within the interior of the housing and accessible to the user through a cut-out through an external wall of the housing.

FIG. 7D depicts a side view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer housing **700**. The figure also shows the user input assembly **715** in an un-actuated state.

FIG. 7E depicts a perspective view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer housing **700**. The diagram also shows the user input assembly **715** in an actuated state where the electrical shield is extended out of the cut-out in the view divider.

FIG. 7F depicts a side view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer **700**. The diagram also shows the user input assembly **715** in an actuated state where the electrical shield is extended out of the cut-out **712** in the view divider.

When a user device is placed within the viewer, such that the touchscreen is facing the interior of the viewer and near the view divider, actuating the user input assembly by actu-

ating the lever can cause the coupling to flex and therefore cause the electrical shield to extend towards and touch the touchscreen of the user device. In this exemplary implementation, the coupling and shield extend out of a cut-out in the view divider. As a result, the device can detect the change in an electrical property at one or more locations of the screen, which is caused by the electrical shield touching (or approaching) the touch-sensitive display.

Accordingly, it can be appreciated that, what is provided is a virtual reality viewer for use with an electronic touchscreen device comprising a housing for receiving and holding a touchscreen display device within an interior region of the housing. The viewer further comprising an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position. In one particular implementation, the input mechanism comprises a lever having a proximal end that is exposed to the exterior of the housing and a distal end disposed within the housing, whereby the proximal end of the lever is accessible by a user from the exterior of the housing and actuation (e.g., movement) of the lever at the proximal end translates to mechanical movement of the distal end. The viewer further comprising a coupling attached to or in communication with the distal end of the lever such that, when the lever is actuated at the proximal end, movement of the lever causes at least a portion of the coupling to move toward a back wall of the housing, e.g., extend or move in a direction of the touchscreen. The viewer further comprises an electrical shield, wherein the electrical shield is a material configured to induce a touch event that is electrically detectable by a touchscreen/device when at least a portion of the shield contacts or is in proximity to a touchscreen. In addition, the portion of the electrical shield is positioned between the coupling and the touchscreen such that movement of the coupling advances at least the portion of the electrical shield material toward the touchscreen so as to induce the touch event. Moreover, the viewer can further comprise a compressible pad disposed between the portion of the coupling and the electrical shield, wherein the pad is attached to the coupling and is sized, shaped and has the softness/rigidness to create a sufficiently sized contact point for generating a touchscreen detection event on the touchscreen device. The compressible pad and electrical shield material work to mimic the electrical and physical properties of a human finger so that any form of touch screen technology will register a touch event when the lever mechanism is actuated. As would be understood by those skilled in the art the combination of physical, and electrical properties of this pad electrical shield material can be tuned to work on a variety of touch screen technologies such as capacitive, resistive, or conductive touch screen technologies. As previously noted, in some implementations, one or more components of the exemplary user input assembly can be integrated into or part of the view divider.

According to a salient aspect, the viewer and the exemplary electro-mechanical user input assembly is configured to allow a user to interact with the touch sensitive screen without access to the touch sensitive screen while within the viewer. Moreover, the exemplary viewer and user input assembly can be configured to allow a user to interact with the touch sensitive screen without reliance on the electrical properties of the human body to induce the electrical event. For instance, the metallized film **725** can be sized such that it is suitable for inducing a touch event without requiring user contact therewith. In addition or alternatively, the portion of the metallized

11

film that is configured to touch the screen can be accessible to receiving a user touch. For instance, a portion of the metallized film can be exposed on the lever **722** or otherwise accessible to the user on an external surface.

As would be understood by those skilled in the art, the mobile electronic device, which has a processor executing instructions in the form of code, can detect that electrical property change at the one or more locations and interpret the change as one or more prescribed user interactions. In some implementations, the user interaction can be interpreted as a simple click event. In some implementations, a variety of possible user interactions can be detected as a function of the location of the touch event on the touchscreen (e.g., as caused by different input mechanisms configured to cause touch inputs at respective locations on the touchscreen), the duration of the touch event, the size of the area of the touchscreen registering the touch event, and the like. These detected aspects of the touch event can be interpreted and translated into one or more prescribed input instructions, for example, a left mouse click or a right mouse click, a double click, or as the user moving a cursor, a virtual gesture such as a grab, push, pull, throw, pinch or as a scaled input instruction such as a hold softly or hold firmly or other such functions.

Moreover, user interactions detected by the touch sensitive display can be interpreted in combination with one or more other input devices. More specifically, a user interaction detected can be interpreted in light of other input data received by the user device from other on-board input devices or data sources, for example and without limitation, an accelerometer that detects the orientation and location of the device or a camera or 3d scanner that detects the physical environment of the user or portions of the users body position. In addition, the housing can also include one or more additional user input devices electrically coupled to the mobile device by a wireless or wired connection, such that inputs via the electro-mechanical input mechanism can be provided to the mobile device in addition to inputs provided using the additional input device. For example, based on the orientation and location of the device and the information being viewed by the user on the device, the device can determine that a user is looking at an interactive virtual icon using the viewer. Paired with the user actuation of the user input mechanism and the detection of a touch input, the device can interpret the combined user input (e.g. accelerometer data and the touch interaction data) as a "mouse click" on that particular virtual icon or as a grab or hold of that virtual item or icon. Another example might be combining the accelerometer data for device position, camera data from the device capturing the users physical environment, and a touch event from the mechanism described in this invention in a way that allows the user to select a real physical item to scan/import into a virtual or augmented reality interface allowing for the digital manipulation of the physical item or overlaying additional information about the physical item.

It can also be appreciated that the user input mechanism can be adapted to induce user interactions at a variety of different locations or multiple user input assemblies can be provided to facilitate more complex user inputs.

It is to be understood that like numerals in the drawings represent like elements through the several figures, and that not all components and/or steps described and illustrated with reference to the figures are required for all embodiments or arrangements.

The subject matter described above is provided by way of illustration only and should not be construed as limiting. The terminology used herein is for the purpose of describing particular embodiments only and is not intended to be limit-

12

ing of the invention. As used herein, the singular forms "a", "an" and "the" are intended to include the plural forms as well, unless the context clearly indicates otherwise. It will be further understood that the terms "comprises" and/or "comprising", when used in this specification, specify the presence of stated features, integers, steps, operations, elements, and/ or components, but do not preclude the presence or addition of one or more other features, integers, steps, operations, elements, components, and/or groups thereof.

Also, the phraseology and terminology used herein is for the purpose of description and should not be regarded as limiting. The use of "including," "comprising," or "having," "containing," "involving," and variations thereof herein, is meant to encompass the items listed thereafter and equivalents thereof as well as additional items.

The subject matter described above is provided by way of illustration only and should not be construed as limiting. Various modifications and changes can be made to the subject matter described herein without following the example embodiments and applications illustrated and described, and without departing from the true spirit and scope of the present invention, as set forth in each and any of the following claims.

What is claimed:

**1**. A virtual reality viewer for use with a mobile electronic device having a touch-screen, the viewer comprising:

a housing configured to receive the mobile electronic device, wherein the housing is configured to hold the mobile electronic device such that the touch-screen is generally centered in a horizontal direction and directly in a user's field of view when looking into a generally hollow interior of the housing through a side opposite the touch-screen;

an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, the input mechanism comprising:

an electrical shield having a surface, wherein only a portion of the surface of the electrical shield is configured to contact a central region of the touch-screen of the mobile electronic device when the input mechanism is in the extended position.

**2**. The virtual reality viewer of claim **1**, wherein input mechanism is configured to provide a capacitive touch input to the touch-screen when the input mechanism is in the extended position, and

wherein at least a portion of the input mechanism is moveable between the first position and the extended position and is located within a central region of the interior that is between a left and a right region of the interior and the field of view such that only the portion of the surface of the electrical shield contacts the central area of the touch-screen of the mobile electronic device.

**3**. The virtual reality viewer of claim **1**, wherein an exterior wall of the housing is shaped to define a cut-out, and wherein at least a first portion of the input mechanism is accessible to the user through the cut-out.

**4**. The virtual reality viewer of claim **3**, wherein the housing substantially encloses the touch-screen within the interior, and further comprising:

a back wall opposite the touch-screen, wherein the back-wall includes a left and a right lens for viewing a left and a right region of the interior and the touch-screen within the housing;

wherein at least a second portion of the input mechanism is generally centered in the horizontal direction within the interior and is configured to move in a direction toward

the touch-screen when the first portion of the input mechanism is actuated; and

wherein the portion of the surface of the electrical shield is disposed on the second portion of the input mechanism and is generally centered within the interior in the horizontal direction whereby the portion is generally located between the left and right regions and is moveable between the first position and the extended position.

**5**. The virtual reality viewer of claim **1**, wherein at least a portion of the input mechanism defines at least a portion of a view divider within the interior of the housing, wherein the view divider is a structure that is generally centered within the interior and at least partially separates a left and a right region of the interior.

**6**. The virtual reality viewer of claim **1**, wherein the electrical shield comprises one or more of: a metallized fabric, a metallized polymer; a conductive polymer, a conductive fabric, a rigid flex printed circuit board and a flexographic ink.

**7**. The virtual reality viewer of claim **6**, wherein the surface of the electrical shield is sized to have electrical properties that are sufficient to be detected by the touch-screen based on capacitance when the input mechanism is in the extended position and only the portion of the surface is contacting the touch-screen.

**8**. The virtual reality viewer of claim **6**, wherein the surface of the electric shield is sized to have sufficient capacitive properties such that contact between only the portion of the surface and the touch-screen can be detected by a capacitive touch-screen when the input mechanism is in the extended position and in the absence of human contact with the electric shield.

**9**. The virtual reality viewer of claim **8**, wherein the only portion of the surface that is configured to contact the touch-screen when the input mechanism is in the extended position is substantially smaller in size than the remaining portion of the surface of electric shield that is not configured to contact the touch-screen.

**10**. The virtual reality viewer of claim **6**, further comprising a compressible pad disposed between the second portion of the input mechanism and the portion of the surface of the electric shield, wherein the pad is configured to create a sufficiently sized area of contact between the portion of the surface and the touch-screen when the input mechanism is in the extended position.

**11**. The virtual reality viewer of claim **10**, wherein the pad is configured to vary the size of the area of contact between the portion of the surface of the electric shield and the touch-screen as a function of a force applied to the input mechanism from the exterior of the housing.

**12**. The virtual reality viewer of claim **1**, wherein the input mechanism includes a lever and a flexible linkage coupled to the housing, wherein the flexible linkage is configured to deform when the lever is actuated and thereby guide at least the portion of the surface between the first position and the extended position.

**13**. The virtual reality viewer of claim **12**, wherein at least a portion of the flexible linkage is integrally formed with the housing.

**14**. The virtual reality viewer of claim **12**, wherein the flexible linkage is configured to return the portion of the surface from the extended position to the first position in the absence of user interaction with the input mechanism.

**15**. The virtual reality viewer of claim **1**, wherein the housing is formed to define a cut-out through an exterior side of the housing; and

wherein the input mechanism further comprises:

a lever that is accessible through the cut-out;

wherein the surface of the electrical shield is sized to have capacitive properties sufficient to provide a detectable capacitive touch input to the touch-screen when the input mechanism is in the extended position and only the portion of the surface contacts the touch-screen; and

a flexible linkage coupled to the lever and the housing, wherein the linkage is configured to flex in response to actuation of the lever and guide at least the portion of the surface between the first position and the extended position and return to the first position in response to release of the lever after actuation is complete.

**16**. The virtual reality viewer of claim **1**, further comprising:

a plurality of input mechanisms;

wherein each of the plurality of input mechanisms are accessible from the exterior of the housing at a respective location and are moveable within the interior;

wherein each of the plurality of input mechanisms have a respective electric shield having a respective surface located within the interior of the housing, and wherein only a respective portion of the respective surface is configured to contact the central region of the touch-screen at a distinct respective location when in the extended position.

**17**. The virtual reality viewer of claim **1**, further comprising at least one additional user input devices that is accessible from an exterior of the housing.

**18**. A virtual reality viewer for use with a mobile electronic device having a capacitive touch-screen, the viewer comprising:

a housing configured to receive the mobile electronic device and substantially enclose the touch-screen within a generally hollow interior of the housing, wherein the housing holds the touch-screen in a position that is generally centered in a horizontal direction and directly in a user's field of view when viewing the touch-screen through a back wall of the housing, wherein the back-wall is opposite the touch-screen and includes a left and a right lens for viewing a left region and a right region of the interior and the touch-screen;

an input device including,

a first portion that is accessible from an exterior of the housing, and

an elongate second portion disposed within the interior of the housing between the left and right regions wherein the second portion is generally oriented in a vertical direction that is perpendicular to the horizontal direction;

an electric shield,

wherein a first surface of the electric shield is disposed on the first portion and is electrically coupled to a second surface of the electric shield,

wherein the second surface is disposed on the second portion within the interior and is generally centered in the horizontal direction between the left and right regions, and wherein only the second surface of the electric shield is configured to contact a central portion of the touch-screen of the mobile electronic device and selectively transfer a capacitive touch input to the touch-screen in response to a user interaction with the first portion of the input mechanism.

**19**. The virtual reality viewer of claim **18**, further comprising:

a compressible pad disposed between the second portion and the second surface to provide an area of contact

between the second surface and the touch-screen that is sufficient to transfer the capacitive touch input;

wherein at least the electric shield includes a conductive material configured to transfer electrical capacitance between the first surface and the touch-screen via the second surface in response to a user interaction with the first surface; and

wherein the second portion of the input mechanism at least partially divides the left and right regions.

**20**. A virtual reality viewer for use with a mobile electronic device having a touch-screen, the viewer comprising:

a housing configured to receive a mobile electronic device within an interior of the housing, wherein the housing is formed to define a cut-out through an exterior side of the housing;

an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, the input mechanism comprising:

a lever that is accessible through the cut-out;

an electrical shield, wherein only portion of a surface of the electrical shield is configured to contact the touch-screen of the mobile electronic device when in the extended position,

a flexible linkage coupled to the lever and the housing, wherein the linkage is configured to deform in response to actuation of the lever and thereby guide the portion of the surface between the first position and the extended position, and

wherein at least a portion of the input mechanism defines at least a portion of a view divider within the interior of the housing.

\* \* \* \* \*

# EXHIBIT B

## TO

## SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF CONTRACT



US009723117B2

(12) **United States Patent** (10) Patent No.: **US 9,723,117 B2**
Buckley (45) Date of Patent: *Aug. 1, 2017

(54) **VIRTUAL REALITY VIEWER AND INPUT MECHANISM**

(71) Applicant: **DODOcase, Inc.**, San Francisco, CA (US)

(72) Inventor: **Patrick Buckley**, Mill Valley, CA (US)

(73) Assignee: **DODOcase, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/209,397**

(22) Filed: **Jul. 13, 2016**

(65) **Prior Publication Data**

US 2016/0337491 A1 Nov. 17, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/801,606, filed on Jul. 16, 2015, now Pat. No. 9,420,075.

(Continued)

(51) **Int. Cl.**
**G02B 27/01** (2006.01)
**H04M 1/05** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ **H04M 1/05** (2013.01); **G02B 27/017** (2013.01); **G02B 27/0176** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ................................... G02B 27/01–2027/0198
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,957,835 B2 2/2015 Hoellwarth
9,176,325 B2 11/2015 Lyons
(Continued)

OTHER PUBLICATIONS

Pace, Tony, "Google Cardboard DIY Guide," Jul. 1, 2014 (available at http://hacklabtaichung.blogspot.com/2014/07/google-cardboard-diy-guide.html).

(Continued)

*Primary Examiner* — Michael Pervan

(57) **ABSTRACT**

The present invention concerns virtual reality viewers for use with touchscreen enabled mobile devices. The virtual reality viewer comprises: a housing configured to receive a mobile electronic device within an interior of the housing; and an input mechanism that is accessible from an exterior of the housing and that is moveable within the interior between a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position. The disclosed systems and methods facilitate receiving user inputs on the exterior of the housing and providing the user inputs to the touchscreen within the housing using the electro-mechanical input mechanism. Accordingly, the viewer can be used with a variety of smartphones without requiring magnetic switches or a wireless/cable connection between the input device and the smartphone.

**20 Claims, 10 Drawing Sheets**



## Related U.S. Application Data

(60) Provisional application No. 62/161,857, filed on May 14, 2015, provisional application No. 62/025,376, filed on Jul. 16, 2014.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 3/044* | (2006.01) |
| *G06T 19/00* | (2011.01) |
| *H04M 1/02* | (2006.01) |
| *H04M 1/21* | (2006.01) |
| *H04M 1/04* | (2006.01) |
| *G06F 1/16* | (2006.01) |
| *G06F 3/01* | (2006.01) |
| *G06F 3/041* | (2006.01) |

(52) **U.S. Cl.**

CPC .............. *G06F 1/163* (2013.01); *G06F 3/011* (2013.01); *G06F 3/041* (2013.01); *G06F 3/044* (2013.01); *G06T 19/006* (2013.01); *H04M 1/0266* (2013.01); *H04M 1/04* (2013.01); *H04M 1/21* (2013.01); *G02B 2027/0178* (2013.01)

(58) **Field of Classification Search**

USPC ........................................... 345/7–9

See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D750,074 S | 2/2016 | Coz | |
| 9,274,340 B2 | 3/2016 | Lyons | |
| 9,377,626 B2 | 6/2016 | Lyons | |
| 9,405,126 B1 | 8/2016 | Margolin | |
| 9,423,827 B2 | 8/2016 | Compton | |
| 2013/0141360 A1* | 6/2013 | Compton | G06F 1/1632 345/173 |
| 2014/0152531 A1* | 6/2014 | Murray | G06F 1/1632 345/8 |
| 2014/0375531 A1 | 12/2014 | Latypov | |
| 2015/0235426 A1 | 8/2015 | Lyons | |
| 2015/0339468 A1 | 11/2015 | Son | |
| 2015/0348327 A1 | 12/2015 | Zalewski | |
| 2015/0364113 A1 | 12/2015 | Ahn | |
| 2016/0054802 A1 | 2/2016 | Dickerson | |
| 2016/0055680 A1 | 2/2016 | Kim | |
| 2016/0062514 A1 | 3/2016 | Jo | |
| 2016/0063767 A1 | 3/2016 | Lee | |
| 2016/0063919 A1 | 3/2016 | Ha | |
| 2016/0066295 A1 | 3/2016 | Han | |
| 2016/0084647 A1 | 3/2016 | Lee | |
| 2016/0086386 A1 | 3/2016 | Son | |
| 2016/0142703 A1 | 5/2016 | Park | |
| 2016/0154494 A1 | 6/2016 | Kim | |
| 2016/0180591 A1 | 6/2016 | Shiu | |
| 2016/0224176 A1 | 8/2016 | Kim | |
| 2016/0232879 A1 | 8/2016 | Han | |
| 2016/0238851 A1 | 8/2016 | Jeong | |
| 2016/0255748 A1 | 9/2016 | Kim | |
| 2016/0262608 A1 | 9/2016 | Krueger | |

### OTHER PUBLICATIONS

Unknown, "Adding a capacitive lever to a google cardboard 1 (on the cheap)," Jul. 6, 2015 (available at https://www.youtube.com/watch?v=kgJpRtnqQPQ).

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



**FIG. 4**



**FIG. 5**



FIG. 6A



FIG. 6B



FIG. 7A



FIG. 7B



FIG. 7C



FIG. 7D



FIG. 7E



FIG. 7F

1

**VIRTUAL REALITY VIEWER AND INPUT MECHANISM**

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/801,606, which was filed on Jul. 16, 2016, titled VIRTUAL REALITY VIEWER AND INPUT MECHANISM, and issued as U.S. Pat. No. 9,420,075, which claims priority to U.S. Provisional Application No. 62/161,857, which was filed on May 14, 2015, titled SYSTEM AND METHOD FOR VIRTUAL REALITY HEADSET USER INTERACTION THROUGH ELECTROMECHANICAL DEVICE AND TOUCHSCREEN, and to U.S. Provisional Application No. 62/025,376, which was filed on Jul. 16, 2014, titled SYSTEM AND METHOD FOR VR HEADSET USER INTERACTION, the contents of which are incorporated by reference herein.

## TECHNICAL FIELD OF THE INVENTION

The present invention relates to virtual reality viewer devices, in particular, virtual reality viewer devices for use with personal mobile electronic devices and having an input device.

## BACKGROUND OF THE INVENTION

Virtual reality viewers and headsets (collectively referred to as viewers) are becoming an increasingly popular way of viewing digital media, gaming and the like. With the widespread distribution of powerful and capable smartphone devices, many VR viewers are designed to use such smartphone devices as the visual display device, instead of having dedicated displays and electronics.

Typically the viewers have a housing that a user looks into in order to view the video display device contained within the housing. Viewers can be hand-held devices that a user holds up to the users face/eyes, for example, like a user would hold a pair of binoculars. Viewers can also be worn on a user's head, so as to free the users hands while looking into the viewer.

As would be understood by those in the art, viewers configured to use a smartphone as the visual display device typically receive the smartphone such that the smart phone display is viewable when a user looks into the viewer housing. These viewers also typically include one or more optical lenses within the housing so as to facilitate a three-dimensional viewing experience despite the two-dimensional display of the smartphone. In some instances the smartphone is completely contained within the housing, in other implementations the smartphone is attached to the housing in a manner such that the display is exposed within the interior of the viewer

One challenge to utilizing a smartphone in these types of viewers is that the touch sensitive display is concealed within the viewer housing, thereby making it difficult for a user to interact with the touch sensitive display of the device. To overcome this, some existing VR viewers utilize magnets on the exterior of the viewer as input devices, however one drawback is that the locations of magnetic sensors on smartphones vary from device to device and, as such, these viewers with magnetic inputs are only effectively used with a limited number of devices. Other VR viewers utilize built in accelerometers or other such position/orientation sensors within the smartphone to detect movement or the absence of

2

movement and identify user inputs using the movement data. Other VR viewers utilize dedicated input devices, like video game controllers, that connect to the electronic device within the viewer either by a wired plug like connection (e.g., USB or Apple compatible connector), or a wireless connection capabilities. However, such VR viewer configurations typically require complex electronic circuitry and wireless connectivity capabilities in order to facilitate the capture and transfer of user inputs. Moreover, dedicated input controllers can be cumbersome when used with hand-held viewer.

What is needed is a VR viewer having integrated user input devices that is configured for use with a wide variety of conventionally available smartphone devices.

These considerations are addressed by the present invention.

## SUMMARY OF THE INVENTION

The present invention concerns a virtual reality viewer including an input mechanism that can be used with mobile electronic device having a touchscreen contained within the viewer. According to a first aspect, the virtual reality viewer for use with a mobile electronic device having a touchscreen, comprises: a housing configured to receive a mobile electronic device within an interior of the housing. In addition, the viewer further comprises an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position.

According to another aspect, the virtual reality viewer for use with a mobile electronic device having a touch-screen, comprises: a housing configured to receive a mobile electronic device within an interior of the housing; and an input device including a first portion that is accessible from an exterior of the housing, and a surface within the interior that is configured to contact the touch-screen of the mobile electronic device and transfer a capacitive touch input to the touch-screen in response to a user interaction with the first portion.

These and other aspects, features, steps and advantages can be further appreciated from the accompanying figures and description of certain illustrative embodiments.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates an exemplary virtual reality viewer;

FIG. **2** illustrates the viewer of FIG. **1**;

FIG. **3** illustrates the viewer of FIG. **1**;

FIG. **4** illustrates an exemplar virtual reality viewer;

FIG. **5** illustrates an exemplary virtual reality viewer;

FIG. **6A** illustrates an exemplary virtual reality viewer including an input mechanism in accordance with an embodiment of the invention;

FIG. **6B** illustrates the viewer of FIG. **6A**;

FIG. **7A** illustrates an exemplary input mechanism for a virtual reality viewer in accordance with an embodiment of the invention;

FIG. **7B** illustrates the exemplary input mechanism for a virtual reality viewer of FIG. **7A**;

FIG. **7C** illustrates an exemplary virtual reality viewer including the input mechanism of FIG. **7A**;

FIG. **7D** illustrates the exemplary viewer and input mechanism of FIG. **7C**;

FIG. 7E illustrates the exemplary viewer and input mechanism of FIG. 7C; and

FIG. 7F illustrates the exemplary viewer and input mechanism of FIG. 7C.

## DETAILED DESCRIPTION OF THE INVENTION

According to an aspect of the subject application, Virtual reality viewer systems and methods are provided that facilitate the capture of user inputs while using the virtual reality viewer. More specifically, the disclosed systems and methods provide a virtual reality viewer for use with a wide variety of personal electronic devices (e.g., a smartphone) as the visual display device, and having improved tactile user input capabilities.

According to a salient aspect, the disclosed systems and methods facilitate receiving tactile user inputs (e.g., user touches, button depressions etc.) on the exterior of the housing of the viewer and providing the user inputs to the touch sensitive display of the smartphone device that is within the viewer housing. In this manner, the disclosed systems and methods provide a viewer that is configured to be useable with a wide variety of smartphones without requiring input devices that require specifically placed magnetic sensors, wireless or dedicated cable connection to the electronic device 15.

In one arrangement, the viewer is provided having a housing that encloses a generally hollow interior. As shown in FIG. 1, which is a perspective view of an exemplary viewer 10 having a conventional construction without an input mechanism. As shown, the viewer comprises a housing 12 that includes a front surface 30, back surface 25, top surface 45, bottom surface 50 (not shown), left surface 40 and right surface 35.

In some implementations, when in operation, housing 12 will be disposed in the position directly in front of the user's eyes such that the lenses contained in the housing, are in alignment with each of the user's eyes and the display of the electronic device is viewable through the lenses. It should be understood that the housing can be held by the user, or worn by the user such that the back surface of the housing is held against or in proximity to the users face.

The housing 12 is configured to receive an electronic device 15 having a touch sensitive display. The electronic device 15 can be any electronic device configured to visually display information via a display (e.g., LED, Plasma, LCD display) and receive user inputs via a touch sensitive user interface (e.g., a capacitive touch sensitive display), as would be understood by those skilled in the art. For example and without limitation, electronic device 15 can include a smartphone or other such personal electronic device having a touch sensitive display, for example, an iPhone or Android smartphone device and the like that are commercially available.

Preferably the electronic device 15 is received or mounted within the interior of the housing 12 such that the electronic device display 17 is viewable when the user is looking through the housing 12. By way of further example, the electronic device 15, can be mounted on the housing such that it defines the back surface of the viewer. It can be appreciated that other configurations for the viewer 10 are envisioned without departing from the scope of the invention.

As shown in FIG. 2, which is a back view of the viewer (the terminology back side of refers to the side that the user looks into), preferably the housing 12 is configured to

receive the electronic device 15 such that the touch sensitive display 17 of the device 15 is centered in a vertical direction 80 and/or a horizontal direction 85.

As shown in FIGS. 1 and 2, in some implementations, the housing includes one or more lenses 70 disposed therein arranged to be in alignment with the user's eyes when the user looks into the viewer. Generally, lenses 70 are mounted such that light from the display of the electronic device passes through lenses 70 to the user's eyes. The configuration, construction and placement of a lens or lenses 70 for use in virtual reality viewers are generally known and understood by those skilled in the art.

A view divider 20 can also be disposed within the housing. FIG. 4 is a perspective view of an exemplary configuration of a viewer 10 lip without a top, bottom and sides and showing the interior space of the viewer including the view divider 20. FIG. 5 shows a bottom view of the interior of an exemplary viewer 10 including view divider 20 and having the left and right, bottom and front sides removed. Referring to FIG. 5, the view divider 20 is configured to isolate the field of view of the left eye from the right eye. In other words, the view divider serves to obstruct the right eye from seeing or receiving images displayed by the left portion 19 of the display 17 of the electronic device 15 and the left eye from seeing images displayed by the right portion 18 of the display 17. It should also be appreciated that the particular width of the left and right portions of the display that are actually viewable by the user can vary depending on the lenses. In some implementations view dividers are not used.

Between the left and right portion of the display 17 is a central portion 14 of the display. The central portion of the display is not viewable by either the left or right eye due to the view divider 20, and, in addition or alternatively, due to the optical characteristics of the lenses 70. The width of the central portion 14 can range from the width of the view divider 20 but can be larger depending on the optical characteristics of the lenses 70. The central portion 14 that is not viewable by either the left or right eye can also vary in shape depending on the optical characteristics of the lenses. For example it might be rectangular or an hour glass shape that is wider towards the top and bottom sides of the viewer and narrower in the middle section of the display 17.

In one arrangement, the viewer 10 is configured to include one or more input devices that are configured to receive user inputs at the exterior of the viewer and provide such inputs directly to the touch sensitive display 17. The input devices can be configured to be passive and/or active input devices.

Preferably the inputs are provided to the display at the central portion 14 of the display, however one or more of the user inputs can be provided to the electronic device at alternative portions of the display 17 as well. Because the central portion 14 of the display is not viewable by the left or right eye to, by providing inputs at the central portion 14, the viewer 10 is capable of providing inputs to the electronic device 15 in a manner that does not disturb the field of view of the left or right eye. Moreover, because the device 15 is received within the housing and preferably positioned such that the display 17 portion of the device is generally centered in at least a horizontal direction and often in vertical direction as well, providing inputs in the central portion 14, for example, where the view divider 20 is proximate to the display 17, allows the systems and methods disclosed herein to be useable with a wide variety of touch sensitive smartphone devices of various sizes and screen layouts. Moreover

software can be configured universally to these touch points regardless of the shape or size of the device because of the centered location.

An exemplary implementation of a viewer including an input mechanism in accordance with an embodiment of the invention is shown in FIG. 6A-6B, which depict a cross-sectional view and of the exemplary viewer 10, including the view divider 20 and the electronic device 15 from the side and back perspective respectively. As shown, the viewer includes input devices that include one or more touchscreen inputs (26a-26d). In this particular exemplary configuration, the touchscreen inputs (26a-26d) are disposed on the distal surface 22 of the view divider 20. Preferably, the electronic device 15 is mounted in a manner such that the touch sensitive display 17 of the device 15, is proximate to (or is touching) at least a portion of the distal surface 22 of the view divider 20, such that the display 17 (not shown from this particular perspective) of the device is in physical contact with the surface of the touchscreen input portion of the input mechanism.

As most smartphones have capacitive touch sensitive displays, in an exemplary implementation, the touchscreen inputs (26a-26d) are constructed from a conductive material, for example, a conductive foam or polymer and the like as are used as the tip of a stylus configured for use with a capacitive touch screen. A compressible material will allow the housing to accommodate devices of varying thicknesses and create a capacative connection between the display and the touchscreen inputs without the screen touching other portions of the surface 22, for example, to prevent scratching of the screen, provide communicative connection between touchscreen input and the touchscreen without cross-talk and other such considerations.

Preferably, the touchscreen inputs (26a-26d) are electrically coupled to one or more user inputs (29a-29d) that are configured to receive user interactions while using the viewer. Preferably the user inputs (29a-29d) are exposed on the outer surfaces of the housing or positioned on the exterior of the housing 12 such that the user can interact with the user inputs (29a-29d) while using the viewer 10, although other configurations are envisioned without departing from the scope of the invention. The user inputs are configured to sense/detect or receive the user interactions and transmit/transfer/relay the user interaction to the touch sensitive display via the touch screen inputs (26a-26d). In some implementations, the user inputs relay the user interactions to the touch screen inputs (26a-26d) via input leads (28a-28d), respectively. For example and without limitation, input leads can be conductive wires/leads that electrically couple the user inputs (29a-29d) to touchscreen inputs (26a-26d).

In such an exemplary configuration in which the input device is a passive input device, the user inputs (e.g., 29a-29d) are preferably constructed of conductive material, for example, a metalized polymer, conductive polymers, conductive/capacitive inks, carbon based inks or other such inks designed to activate capacitive screens. Accordingly, a user touch of a conductive user input (e.g., 29a), via the conductive lead (e.g., 28a) and touchscreen input (e.g., 26a), will alter the electrical properties of the portion of the display 17 that is in contact with the touchscreen input.

As will be understood by those skilled in the art, the device 15 having a capacitive touch sensitive display 17 can detect the particular location of a change in the electrical property that is caused by the user touch of the user input (e.g., 29a). As would be understood by those skilled in the art, based on the particular location of the sensed change, the

device 15, which has a processor executing instructions in the form of code, can interpret that an electrical change sensed at a particular location on the display 17 corresponds to a user interaction with a particular user input and corresponds to a prescribed input instruction, for example, a left mouse click or a right mouse click, or a double click, or as the user moving a cursor, or other such functions. Moreover, it would be understood that other combinations of user interactions sensed by the touch sensitive display can be interpreted as one or more of a number of user inputs such as pushing all 4 buttons at once could represent grabbing a virtual item. The 3 dimensional physical interaction offered by the users hands wrapping around the virtual reality viewer and interacting with the inputs can more easily be translated into 3 dimensional virtual interactions in a more natural way then previous user input mechanisms used today. It should also be understood that the arrangement of the touchscreen inputs the corresponding user inputs and associated functions can be pre-defined in software that is loaded into and executing in the device 15 processor.

Although an exemplary passive input device configuration having 4 distinct user inputs has been disclosed, it can be appreciated that other passive input device configurations are envisioned. For example an array of user inputs and corresponding touchscreen inputs can be provided. It should also be understood that other active input device configurations can also be implemented in accordance with the disclosed embodiments without departing from the scope of the invention.

Although FIG. 6A shows the user inputs positioned on the top and bottom surfaces of the housing 12 and also shows that the leads run through the view divider 20 and through the top and bottom surfaces of the housing to corresponding user inputs, it can be appreciated that the leads can run through any portions of the housing. It can be further appreciated that any number of the user inputs (29a-29d) can be located on any portion of the housing and in any orientation or configuration. Moreover, it can be further appreciated that any number of touchscreen inputs (e.g., 26a-26d) can be located on the distal end 22 and in any orientation or configuration.

Moreover, although the exemplary configuration provides the user inputs to the screen 17 at the central portion 14 of the display 17 via the view divider 20, other configurations are possible. For example, the viewer can provide such touchscreen inputs (e.g., 26a-26d) on a surface that abuts one or more other portions the display 17.

In accordance with the disclosed embodiments of the invention, the exemplary viewers can be configured to allow the user to mechanically induce an electrical/capacitive touch event on the touchscreen. Further to the foregoing exemplary embodiments of the invention, additional exemplary configurations of a viewer having an input mechanism, which is also referred to as the user input assembly, configured to induce a capacitive touch event that is detectable by a touchscreen based on mutual-capacitance are further described herein. It can be appreciated that the exemplary implementation described herein can be adapted to mechanically induce input events on a variety of types of touchscreens (e.g., resistive touchscreen events, touch events). Additional exemplary configurations of the viewer in accordance with the disclosed embodiments are further described herein in relation to FIGS. 7A-7F.

FIG. 7C depicts a perspective view of a viewer 700 assembled and having a front side open showing the generally hollow interior of the viewer. Also shown is an input mechanism 715. The input mechanism is disposed within the

interior **702** of the housing of the viewer **700**. Moreover, at least a portion of the input mechanism is also accessible from the exterior of the viewer such that a user can interact with the input mechanism and cause the portion of the input mechanism contained within the housing to generate a touch input on the touch interface. More specifically, the input mechanism is moveable within the interior between at least a first position (also referred to as an unactuated state), in which a portion of the input mechanism is retracted so as to not contact a touchscreen of the mobile device, and an extended position (also referred to as the actuated state) in which a surface of the input mechanism contacts the touchscreen of the mobile electronic. As shown, at least a portion of the input mechanism is centrally located within the housing and defines at least a portion of a view divider **710**. It should be appreciated that the housing and or one or more portions of the input mechanism further described herein can be comprised of a variety of materials such as plastics, metals, composites, woods and other heavy paper-like materials (e.g., cardboard) or other such natural and synthetic materials.

FIG. 7A depicts the view divider **710** with one side of the view divider folded back so as to expose a portion of the user input mechanism **715** disposed within the interior of the viewer **700**. The diagram also shows the user input mechanism **715** in an unactuated state.

As shown, FIG. 7A depicts a distal end **720** of a user input portion of the user input mechanism, which in this exemplary implementation is a lever. The proximal end (not shown) of the lever is accessible to a user from outside the viewer when assembled. The diagram depicts the input assembly **715** in an un-actuated state. Also shown is an electrical shield **725**. The electric shield is arranged such that at least a portion of the electric shield is configured to contact the touch-screen of the mobile electronic device when the input mechanism is in the extended position. The electrical shield is a material configured to, when brought in proximity to and/or touches the touchscreen, induce a touch event that is electrically detectable by the touchscreen/ device. In some implementations the electrical shield material can be a metallized textile/fabric or films, e.g., polymer film coated with a thin layer of metal, for example PET (Polyethylene terephthalate) films and Mylar (BoPET Biaxially-oriented polyethylene terephthalate). Such metallized materials are commonly used in anti-static bags. Moreover, the electrical shield can be comprised of other metallic conductors, non-metallic conductors, metallized fabrics, metallized polymers, conductive polymers, conductive fabrics, flexographic inks, rigid flex printed circuit board (PCB) and the like. As would be understood by those skilled in the art, such materials have electrical properties that, when a surface of the material is brought in proximity to a touchscreen and/or touches a touchscreen, can affect the electrical properties detected at that location by the touchscreen device. Other materials having the requisite electrical properties can also be used, for example, inks or pastes with carbon such as black flexographic inks having capacitive touch properties that are printed on substrates. Moreover, it can be appreciated that a combination of materials can be used to provide a surface of the input mechanism that is configured to induce a detectable touch input when the surface is touched to the touchscreen. For example the electric shield can include a conductive polymer arranged to selectively contact the touchscreen and that is electrically coupled to a metallized fabric or conductive ink applied to a surface of the housing and/or input mechanism.

In some implementations, the electric shield is configured (e.g., sized and/or positioned) so as to have capacitive properties sufficient to be detected by a capacitive touch-screen when the input mechanism is in the extended position and in the absence of human contact with the electric shield. However, it can also be appreciated that, in some implementations, the electric shield can be electrically coupled to the portion of the input mechanism that is interacted with by the user such that electrical properties of the user's body can be utilized to induce the touch input.

Also shown is a coupling **730** that is configured to move the input mechanism towards the touchscreen when the lever is actuated. The coupling is a linkage that couples the portion of the input mechanism that is accessible to the user from the exterior (e.g., the proximal end of the lever) to the surface of the input mechanism configured to touch the touchscreen and induce a touch input. The coupling mechanically translates user actuation of the portion of the input mechanism from the exterior of the housing into movement of the input mechanism within the interior of the housing and causing a surface of the input mechanism to touch the touchscreen. For example, in the particular implementation shown in FIGS. 7A-7F, actuation of the lever causes the coupling to deform and extend in a direction towards the touchscreen, which in turn moves a portion of the electrical shield towards the touchscreen. Furthermore, as shown in FIG. 7A the coupling can be coupled to the housing. As can be appreciated, coupling one or more portions of the input mechanism to the housing can serve to support the input mechanism as well as guide the movement of the input mechanism during user actuation.

The coupling can be comprised of one or more flexible materials such as plastics, metals, composites, woods and other heavy paper-like materials (e.g., cardboard) and or other such natural and synthetic materials. A linkage or coupling that is flexible can be beneficial in that the material memory causes the coupling to return to a resting state when pressure is released from the lever which automatically pulls the input mechanism away from the touchscreen. However, alternative methods for automatically retracting the contact surface of the input mechanism can be similarly implemented without departing from the scope of the invention.

Although a particular exemplary linkage configuration is described in relation to FIGS. 7A-7F, it can be appreciated that other linkage configurations can be implemented without departing from the scope of the invention. It can also be appreciated that, although the lever, coupling and metallic shield have been described as individual components, the subject invention is not so limited as one or more of the foregoing components can be joined or integrally formed as single unit. Similarly, it can also be appreciated that one or more of the components of the input mechanism can be joined to the housing or integrally formed with the housing in a permanent or temporary fashion using any conventional manufacturing techniques.

In some implementations, a compressible pad **735**, for example, a foam or foam-like material can be disposed between the flexible coupling and the electric shield. The pad can be placed between the flexible coupling and the electrical shield **725** in at least the location where the coupling contacts the metallic shield when extended (e.g., the back side of the electrical shield where the front side of the shield material contacts the touchscreen when extended). It can be appreciated that the electrical shield can be attached to the foam material or unattached. It can also be appreciated that the pad can be coupled to the coupling either directly or indirectly by one or more intermediate structures that com-

prise the input mechanism. The pad is used to create a sufficiently sized contact surface between the front side of the shield material and the touchscreen so as to register a touch input event on the screen (e.g., to simulate the size and shape of a finger). The pad also helps the surface of the input mechanism configured to touch the touchscreen (i.e., the shield material) conform to the touchscreen surface when the input mechanism is in the extended position/actuated state.

It can be appreciated that various sizes and shapes of the pad can be used to induce a sufficient sized contact surface. It can also be appreciated that in some implementations the pad can be omitted. It can also be appreciated that the metallic shield and pad may be integrated or combined into a single material such as conductive foam gaskets used in Electromagnetic Interference (EMI) or Radio Frequency Interference (RFI) applications. It can also be appreciated that the pad can be sized and/or shaped such that actuating the input mechanism with greater force causes a greater surface area of the electrical shield to be applied to the screen which can be interpreted differently by the device than when a smaller surface area is detected by the touchscreen. This input mechanism configuration can be used to provide a secondary signal for detecting the amplitude of the users input, for example a method for detecting the amount of force the user applied to the input.

A portion of the lever can be attached to or in communication with (i.e., touching) or integrally formed to at least a portion of the coupling. For instance, as shown, the distal end of the lever can be abutting a portion of the coupling such that, when the lever is actuated at a proximal end, movement of the distal end of the lever causes the plastic coupling to buckle and at least a portion of the coupling extends in the direction towards the touchscreen. In addition or alternatively the coupling can be a structure that is flexibly coupled to one or more portions of the housing such that it moves in a prescribed manner when a lever is moved or a button is pushed by the user.

FIG. 7A depicts the view divider **710** with one side of the view divider folded back so as to expose the user input assembly **715** disposed within the view divider of the viewer **700**. The diagram also shows the user input assembly **715** in an unactuated state.

FIG. 7B depicts the view divider **710** with one side of the view divider folded back so as to expose the user input assembly **715** disposed within the view divider of the viewer **700**. The diagram also shows the user input assembly **715** in an actuated state.

FIG. 7C depicts a perspective view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the housing **700**. The diagram also shows the user input assembly **715** in an un-actuated state. As shown, the user input (lever) includes a proximal end portion **722** that extends through a cut-out in the housing of the viewer **700** and is accordingly accessible to the user from the exterior of the housing. It can be appreciated that alternative configurations in which one or more portions of the lever or other such mechanical actuators or portions of the input mechanism is accessible from the exterior of the viewer are envisioned. For instance the lever can be contained within the interior of the housing and accessible to the user through a cut-out through an external wall of the housing.

FIG. 7D depicts a side view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the

interior of the viewer housing **700**. The figure also shows the user input assembly **715** in an un-actuated state.

FIG. 7E depicts a perspective view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer housing **700**. The diagram also shows the user input assembly **715** in an actuated state where the electrical shield is extended out of the cut-out in the view divider.

FIG. 7F depicts a side view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer **700**. The diagram also shows the user input assembly **715** in an actuated state where the electrical shield is extended out of the cut-out **712** in the view divider.

When a user device is placed within the viewer, such that the touchscreen is facing the interior of the viewer and near the view divider, actuating the user input assembly by actuating the lever can cause the coupling to flex and therefore cause the electrical shield to extend towards and touch the touchscreen of the user device. In this exemplary implementation, the coupling and shield extend out of a cut-out in the view divider. As a result, the device can detect the change in an electrical property at one or more locations of the screen, which is caused by the electrical shield touching (or approaching) the touch-sensitive display.

Accordingly, it can be appreciated that, what is provided is a virtual reality viewer for use with an electronic touch-screen device comprising a housing for receiving and holding a touchscreen display device within an interior region of the housing. The viewer further comprising an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position. In one particular implementation, the input mechanism comprises a lever having a proximal end that is exposed to the exterior of the housing and a distal end disposed within the housing, whereby the proximal end of the lever is accessible by a user from the exterior of the housing and actuation (e.g., movement) of the lever at the proximal end translates to mechanical movement of the distal end. The viewer further comprising a coupling attached to or in communication with the distal end of the lever such that, when the lever is actuated at the proximal end, movement of the lever causes at least a portion of the coupling to move toward a back wall of the housing, e.g., extend or move in a direction of the touchscreen. The viewer further comprises an electrical shield, wherein the electrical shield is a material configured to induce a touch event that is electrically detectable by a touchscreen/device when at least a portion of the shield contacts or is in proximity to a touchscreen. In addition, the portion of the electrical shield is positioned between the coupling and the touchscreen such that movement of the coupling advances at least the portion of the electrical shield material toward the touchscreen so as to induce the touch event. Moreover, the viewer can further comprise a compressible pad disposed between the portion of the coupling and the electrical shield, wherein the pad is attached to the coupling and is sized, shaped and has the softness/rigidness to create a sufficiently sized contact point for generating a touchscreen detection event on the touchscreen device. The compressible pad and electrical shield material work to mimic the electrical and physical properties of a human finger so that any form of touch screen technology will register a touch event when the lever mechanism

is actuated. As would be understood by those skilled in the art the combination of physical, and electrical properties of this pad electrical shield material can be tuned to work on a variety of touch screen technologies such as capacitive, resistive, or conductive touch screen technologies. As previously noted, in some implementations, one or more components of the exemplary user input assembly can be integrated into or part of the view divider.

According to a salient aspect, the viewer and the exemplary electro-mechanical user input assembly is configured to allow a user to interact with the touch sensitive screen without access to the touch sensitive screen while within the viewer. Moreover, the exemplary viewer and user input assembly can be configured to allow a user to interact with the touch sensitive screen without reliance on the electrical properties of the human body to induce the electrical event. For instance, the metallized film **725** can be sized such that it is suitable for inducing a touch event without requiring user contact therewith. In addition or alternatively, the portion of the metallized film that is configured to touch the screen can be accessible to receiving a user touch. For instance, a portion of the metallized film can be exposed on the lever **722** or otherwise accessible to the user on an external surface.

As would be understood by those skilled in the art, the mobile electronic device, which has a processor executing instructions in the form of code, can detect that electrical property change at the one or more locations and interpret the change as one or more prescribed user interactions. In some implementations, the user interaction can be interpreted as a simple click event. In some implementations, a variety of possible user interactions can be detected as a function of the location of the touch event on the touchscreen (e.g., as caused by different input mechanisms configured to cause touch inputs at respective locations on the touchscreen), the duration of the touch event, the size of the area of the touchscreen registering the touch event, and the like. These detected aspects of the touch event can be interpreted and translated into one or more prescribed input instructions, for example, a left mouse click or a right mouse click, a double click, or as the user moving a cursor, a virtual gesture such as a grab, push, pull, throw, pinch or as a scaled input instruction such as a hold softly or hold firmly or other such functions.

Moreover, user interactions detected by the touch sensitive display can be interpreted in combination with one or more other input devices. More specifically, a user interaction detected can be interpreted in light of other input data received by the user device from other on-board input devices or data sources, for example and without limitation, an accelerometer that detects the orientation and location of the device or a camera or 3d scanner that detects the physical environment of the user or portions of the users body position. In addition, the housing can also include one or more additional user input devices electrically coupled to the mobile device by a wireless or wired connection, such that inputs via the electro-mechanical input mechanism can be provided to the mobile device in addition to inputs provided using the additional input device. For example, based on the orientation and location of the device and the information being viewed by the user on the device, the device can determine that a user is looking at an interactive virtual icon using the viewer. Paired with the user actuation of the user input mechanism and the detection of a touch input, the device can interpret the combined user input (e.g. accelerometer data and the touch interaction data) as a "mouse click" on that particular virtual icon or as a grab or hold of

that virtual item or icon. Another example might be combining the accelerometer data for device position, camera data from the device capturing the users physical environment, and a touch event from the mechanism described in this invention in a way that allows the user to select a real physical item to scan/import into a virtual or augmented reality interface allowing for the digital manipulation of the physical item or overlaying additional information about the physical item.

It can also be appreciated that the user input mechanism can be adapted to induce user interactions at a variety of different locations or multiple user input assemblies can be provided to facilitate more complex user inputs.

It is to be understood that like numerals in the drawings represent like elements through the several figures, and that not all components and/or steps described and illustrated with reference to the figures are required for all embodiments or arrangements.

The subject matter described above is provided by way of illustration only and should not be construed as limiting. The terminology used herein is for the purpose of describing particular embodiments only and is not intended to be limiting of the invention. As used herein, the singular forms "a", "an" and "the" are intended to include the plural forms as well, unless the context clearly indicates otherwise. It will be further understood that the terms "comprises" and/or "comprising", when used in this specification, specify the presence of stated features, integers, steps, operations, elements, and/or components, but do not preclude the presence or addition of one or more other features, integers, steps, operations, elements, components, and/or groups thereof.

Also, the phraseology and terminology used herein is for the purpose of description and should not be regarded as limiting. The use of "including," "comprising," or "having," "containing," "involving," and variations thereof herein, is meant to encompass the items listed thereafter and equivalents thereof as well as additional items.

The subject matter described above is provided by way of illustration only and should not be construed as limiting. Various modifications and changes can be made to the subject matter described herein without following the example embodiments and applications illustrated and described, and without departing from the true spirit and scope of the present invention, as set forth in each and any of the following claims.

What is claimed:

1. A virtual reality viewer for use with a mobile electronic device having a touchscreen, the viewer comprising:
    a first lens and a second lens, wherein the first lens is facing the same direction as the second lens, and wherein the first lens and the second lens are spaced apart in a horizontal direction;
    a housing having a back side configured to be held against or in proximity to a user's face and a front side configured to receive the mobile electronic device, the front side of the housing opposite the back side of the housing such that the touchscreen is viewable from the back side of the housing and through the first lens and the second lens;
    a touchscreen input constructed of conductive material, wherein the touchscreen input is in physical contact with the touchscreen upon receipt of the mobile electronic device.

2. The virtual reality viewer of claim **1**, further comprising a user input that is accessible from an exterior of the housing and is conductively coupled to the touchscreen input.

**3**. The virtual reality viewer of claim **2**, further comprising a lead that conductively couples the touchscreen input to the user input, wherein a portion of the lead runs through a portion of the housing.

**4**. The virtual reality viewer of claim **1**, wherein a portion of the housing has a cut-out, and wherein at least a portion of the user input is accessible through the cut-out.

**5**. The virtual reality viewer of claim **1**, wherein the conductive material is a conductive foam or polymer.

**6**. The virtual reality viewer of claim **1**, further comprising a second touchscreen input constructed of conductive material, wherein the second touchscreen input is generally centered between the first lens and the second lens in the horizontal direction and in physical contact with the touchscreen upon receipt of the mobile electronic device.

**7**. The virtual reality viewer of claim **6**, wherein the touchscreen input is offset upwards in a vertical direction and the second touchscreen input is offset downwards in the vertical direction.

**8**. The virtual reality viewer of claim **6**, wherein the user input is a metal or conductive polymer.

**9**. The virtual reality viewer of claim **1**, wherein the touchscreen input is offset in the vertical direction.

**10**. The virtual reality viewer of claim **9**, wherein the first lens and the second lens are configured to facilitate a three-dimensional viewing experience.

**11**. The virtual reality viewer of claim **9**, wherein the touchscreen input is generally centered between the first lens and the second lens in the horizontal direction.

**12**. A virtual reality viewer for use with a mobile electronic device having a touchscreen, the viewer comprising:

a first lens and a second lens, wherein the first lens is facing the same direction as the second lens, and wherein the first lens and the second lens are spaced apart in a horizontal direction;

a housing having a back side configured to be held against or in proximity to a user's face and a front side configured to receive the mobile electronic device, the front side of the housing opposite the back side of the

housing such that the touchscreen is viewable from the back side of the housing and through the first lens and the second lens;

a user input that is accessible from an exterior of the housing and has a first position and a second position;

a touchscreen input conductively coupled to the user input and generally centered between the first lens and the second lens in the horizontal direction, wherein, upon receipt of the mobile electronic device, the touchscreen input is in physical contact with the touchscreen when the user input is in the second position.

**13**. The virtual reality viewer of claim **12**, wherein a portion of the housing has a cut-out, and wherein at least a portion of the user input is accessible through the cut-out.

**14**. The virtual reality viewer of claim **12**, wherein the touchscreen input is constructed of a conductive material.

**15**. The virtual reality viewer of claim **14**, wherein the conductive material is a conductive foam or polymer.

**16**. The virtual reality viewer of claim **12**, further comprising:

a second user input that is accessible from an exterior of the housing and has a first position and a second position; and

a second touchscreen input conductively coupled to the second user input, wherein, upon receipt of the mobile electronic device, the second touchscreen input is in physical contact with the touchscreen when the second user input is in the second position.

**17**. The virtual reality viewer of claim **16**, wherein the touchscreen input is offset upwards in a vertical direction and the second touchscreen input is offset downwards in the vertical direction.

**18**. The virtual reality viewer of claim **12**, wherein the touchscreen input is offset in a vertical direction.

**19**. The virtual reality viewer of claim **12**, further comprising a lead that conductively couples the touchscreen input to the user input, wherein a portion of the lead runs through a portion of the housing.

**20**. The virtual reality viewer of claim **12**, wherein the user input is a metal or conductive polymer.

* * * * *

# EXHIBIT C

## TO

## SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT; INJUNCTIVE RELIEF; AND BREACH OF CONTRACT



US009811184B2

(12) **United States Patent**

Buckley

(10) Patent No.: **US 9,811,184 B2**

(45) Date of Patent: **Nov. 7, 2017**

(54) **VIRTUAL REALITY VIEWER AND INPUT MECHANISM**

(71) Applicant: **DODOcase, Inc.**, San Francisco, CA (US)

(72) Inventor: **Patrick Buckley**, Mill Valley, CA (US)

(73) Assignee: **DODOcase, Inc.**, San Francisco, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/448,785**

(22) Filed: **Mar. 3, 2017**

(65) **Prior Publication Data**

US 2017/0177095 A1 Jun. 22, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 15/209,397, filed on Jul. 13, 2016, which is a continuation of application

(Continued)

(51) **Int. Cl.**
**G02B 27/01** (2006.01)
**G06F 3/038** (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC ......... **G06F 3/038** (2013.01); **G02B 27/2228** (2013.01); **G06F 3/011** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .................................. G02B 27/01–2027/0198
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,957,835 B2 2/2015 Hoellwarth
9,176,325 B2 11/2015 Lyons
(Continued)

OTHER PUBLICATIONS

Pace, Tony, "Google Cardboard DIY Guide," Jul. 1, 2014 (available at http://hacklabtaichung.blogspot.com/2014/07/google-cardboard-diy-guide.html).

(Continued)

*Primary Examiner* — Michael Pervan
(74) *Attorney, Agent, or Firm* — Marton Ribera Schumann & Chang LLP

(57) **ABSTRACT**

The present invention concerns virtual reality viewers for use with touchscreen enabled mobile devices. The virtual reality viewer comprises: a housing configured to receive a mobile electronic device within an interior of the housing; and an input mechanism that is accessible from an exterior of the housing and that is moveable within the interior between a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position. The disclosed systems and methods facilitate receiving user inputs on the exterior of the housing and providing the user inputs to the touchscreen within the housing using the electro-mechanical input mechanism. Accordingly, the viewer can be used with a variety of smartphones without requiring magnetic switches or a wire-less/cable connection between the input device and the smartphone.

**20 Claims, 10 Drawing Sheets**



## Related U.S. Application Data

No. 14/801,606, filed on Jul. 16, 2015, now Pat. No. 9,420,075.

(60) Provisional application No. 62/161,857, filed on May 14, 2015, provisional application No. 62/025,376, filed on Jul. 16, 2014.

(51) **Int. Cl.**

| | |
|---|---|
| *H04M 1/05* | (2006.01) |
| *H04M 1/02* | (2006.01) |
| *H04M 1/21* | (2006.01) |
| *G02B 27/22* | (2006.01) |
| *G06F 3/044* | (2006.01) |
| *G06F 3/0354* | (2013.01) |
| *G06F 3/01* | (2006.01) |

(52) **U.S. Cl.**

CPC .......... *G06F 3/017* (2013.01); *G06F 3/03547* (2013.01); *G06F 3/044* (2013.01); *H04M 1/0266* (2013.01); *H04M 1/05* (2013.01); *H04M 1/21* (2013.01)

(58) **Field of Classification Search**

USPC ........................................ 345/7–9
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D750,074 S | 2/2016 | Coz | |
| 9,274,340 B2 | 3/2016 | Lyons | |
| 9,377,626 B2 | 6/2016 | Lyons | |
| 9,405,126 B1 | 8/2016 | Margolin | |
| 9,423,827 B2 | 8/2016 | Compton | |
| 2014/0152531 A1 * | 6/2014 | Murray ................. G06F 1/1632 345/8 |
| 2014/0375531 A1 | 12/2014 | Latypov | |
| 2015/0235426 A1 | 8/2015 | Lyons | |
| 2015/0339468 A1 | 11/2015 | Son | |
| 2015/0348327 A1 | 12/2015 | Zalewski | |
| 2015/0364113 A1 | 12/2015 | Ahn | |
| 2016/0054802 A1 | 2/2016 | Dickerson | |
| 2016/0055680 A1 | 2/2016 | Kim | |
| 2016/0062514 A1 | 3/2016 | Jo | |
| 2016/0063767 A1 | 3/2016 | Lee | |
| 2016/0063919 A1 | 3/2016 | Ha | |
| 2016/0066295 A1 | 3/2016 | Han | |
| 2016/0084647 A1 | 3/2016 | Lee | |
| 2016/0086386 A1 | 3/2016 | Son | |
| 2016/0142703 A1 | 5/2016 | Park | |
| 2016/0154494 A1 | 6/2016 | Kim | |
| 2016/0180591 A1 | 6/2016 | Shiu | |
| 2016/0224176 A1 | 8/2016 | Kim | |
| 2016/0232879 A1 | 8/2016 | Han | |
| 2016/0238851 A1 | 8/2016 | Jeong | |
| 2016/0255748 A1 | 9/2016 | Kim | |
| 2016/0262608 A1 | 9/2016 | Krueger | |

### OTHER PUBLICATIONS

Unknown, "Adding a capacitive lever to a google cardboard 1 (on the cheap)," Jul. 6, 2015 (available at https://www.youtube.com/watch?v=kgJpRtnqQPQ).

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6A



FIG. 6B



FIG. 7A



FIG. 7B



FIG. 7C



**FIG. 7D**



FIG. 7E



FIG. 7F

1

# VIRTUAL REALITY VIEWER AND INPUT MECHANISM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/209,397, titled VIRTUAL REALITY VIEWER AND INPUT MECHANISM, which was filed on Jul. 13, 2016, which is a continuation of U.S. patent application Ser. No. 14/801,606, which was filed on Jul. 16, 2015, titled VIRTUAL REALITY VIEWER AND INPUT MECHANISM, and issued as U.S. Pat. No. 9,420,075, which claims priority to U.S. Provisional Application No. 62/161,857, which was filed on May 14, 2015, titled SYSTEM AND METHOD FOR VIRTUAL REALITY HEADSET USER INTERACTION THROUGH ELECTROMECHANICAL DEVICE AND TOUCHSCREEN, and to U.S. Provisional Application No. 62/025,376, which was filed on Jul. 16, 2014, titled SYSTEM AND METHOD FOR VR HEADSET USER INTERACTION, which are each hereby incorporated by reference as if set forth in their respective entireties herein.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

## THE NAMES OF THE PARTIES TO A JOINT RESEARCH AGREEMENT

Not applicable.

## INCORPORATION-BY-REFERENCE OF MATERIAL SUBMITTED ON A COMPACT DISC OR AS A TEXT FILE VIA THE OFFICE ELECTRONIC FILING SYSTEM (EFS-WEB)

Not applicable.

## STATEMENT REGARDING PRIOR DISCLOSURES BY THE INVENTOR OR A JOINT INVENTOR

Not applicable.

## BACKGROUND OF THE INVENTION

Virtual reality viewers and headsets (collectively referred to as viewers) are becoming an increasingly popular way of viewing digital media, gaming and the like. With the widespread distribution of powerful and capable smartphone devices, many VR viewers are designed to use such smartphone devices as the visual display device, instead of having dedicated displays and electronics.

Typically the viewers have a housing that a user looks into in order to view the video display device contained within the housing. Viewers can be hand-held devices that a user holds up to the users face/eyes, for example, like a user would hold a pair of binoculars. Viewers can also be worn on a user's head, so as to free the user's hands while looking into the viewer.

As would be understood by those in the art, viewers configured to use a smartphone as the visual display device typically receive the smartphone such that the smart phone display is viewable when a user looks into the viewer

2

housing. These viewers also typically include one or more optical lenses within the housing so as to facilitate a three-dimensional viewing experience despite the two-dimensional display of the smartphone. In some instances, the smartphone is completely contained within the housing, in other implementations the smartphone is attached to the housing in a manner such that the display is exposed within the interior of the viewer

One challenge to utilizing a smartphone in these types of viewers is that the touch sensitive display is concealed within the viewer housing, thereby making it difficult for a user to interact with the touch sensitive display of the device. To overcome this, some existing VR viewers utilize magnets on the exterior of the viewer as input devices, however one drawback is that the locations of magnetic sensors on smartphones vary from device to device and, as such, these viewers with magnetic inputs are only effectively used with a limited number of devices. Other VR viewers utilize built in accelerometers or other such position/orientation sensors within the smartphone to detect movement or the absence of movement and identify user inputs using the movement data. Other VR viewers utilize dedicated input devices, like video game controllers, that connect to the electronic device within the viewer either by a wired plug like connection (e.g., USB or Apple compatible connector), or a wireless connection capabilities. However, such VR viewer configurations typically require complex electronic circuitry and wireless connectivity capabilities in order to facilitate the capture and transfer of user inputs. Moreover, dedicated input controllers can be cumbersome when used with hand-held viewer.

What is needed is a VR viewer having integrated user input devices that is configured for use with a wide variety of conventionally available smartphone devices.

These considerations are addressed by the present invention.

## BRIEF SUMMARY OF THE INVENTION

The present invention concerns a virtual reality viewer including an input mechanism that can be used with mobile electronic device having a touchscreen contained within the viewer. According to a first aspect, the virtual reality viewer for use with a mobile electronic device having a touch-screen, comprises: a housing configured to receive a mobile electronic device within an interior of the housing. In addition, the viewer further comprises an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position.

According to another aspect, the virtual reality viewer for use with a mobile electronic device having a touch-screen, comprises: a housing configured to receive a mobile electronic device within an interior of the housing; and an input device including a first portion that is accessible from an exterior of the housing, and a surface within the interior that is configured to contact the touch-screen of the mobile electronic device and transfer a capacitive touch input to the touch-screen in response to a user interaction with the first portion.

These and other aspects, features, steps and advantages can be further appreciated from the accompanying figures and description of certain illustrative embodiments.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

FIG. **1** illustrates an exemplary virtual reality viewer;

FIG. **2** illustrates the viewer of FIG. **1**;

FIG. **3** illustrates the viewer of FIG. **1**;

FIG. **4** illustrates an exemplary virtual reality viewer;

FIG. **5** illustrates an exemplary virtual reality viewer;

FIG. **6A** illustrates an exemplary virtual reality viewer including an input mechanism in accordance with an embodiment of the invention;

FIG. **6B** illustrates the viewer of FIG. **6A**;

FIG. **7A** illustrates an exemplary input mechanism for a virtual reality viewer in accordance with an embodiment of the invention;

FIG. **7B** illustrates the exemplary input mechanism for a virtual reality viewer of FIG. **7A**;

FIG. **7C** illustrates an exemplary virtual reality viewer including the input mechanism of FIG. **7A**;

FIG. **7D** illustrates the exemplary viewer and input mechanism of FIG. **7C**;

FIG. **7E** illustrates the exemplary viewer and input mechanism of FIG. **7C**; and

FIG. **7F** illustrates the exemplary viewer and input mechanism of FIG. **7C**.

## DETAILED DESCRIPTION OF THE INVENTION

According to an aspect of the subject application, Virtual reality viewer systems and methods are provided that facilitate the capture of user inputs while using the virtual reality viewer. More specifically, the disclosed systems and methods provide a virtual reality viewer for use with a wide variety of personal electronic devices (e.g., a smartphone) as the visual display device, and having improved tactile user input capabilities.

According to a salient aspect, the disclosed systems and methods facilitate receiving tactile user inputs (e.g., user touches, button depressions etc.) on the exterior of the housing of the viewer and providing the user inputs to the touch sensitive display of the smartphone device that is within the user housing. In this manner, the disclosed systems and methods provide a viewer that is configured to be useable with a wide variety of smartphones without requiring input devices that require specifically placed magnetic sensors, wireless or dedicated cable connection to the electronic device **15**.

In one arrangement, the viewer is provided having a housing that encloses a generally hollow interior. As shown in FIG. **1**, which is a perspective view of an exemplary viewer **10** having a conventional construction without an input mechanism. As shown, the viewer comprises a housing **12** that includes a front surface **30**, back surface **25**, top surface **45**, bottom surface **50** (not shown), left surface **40** and right surface **35**.

In some implementations, when in operation, housing **12** will be disposed in the position directly in front of the user's eyes such that the lenses contained in the housing, are in alignment with each of the user's eyes and the display of the electronic device is viewable through the lenses. It should be understood that the housing can be held by the user, or worn by the user such that the back surface of the housing is held against or in proximity to the users face.

The housing **12** is configured to receive an electronic device **15** having a touch sensitive display. The electronic device **15** can be any electronic device configured to visually

display information via a display (e.g., LED, Plasma, LCD display) and receive user inputs via a touch sensitive user interface (e.g., a capacitive touch sensitive display), as would be understood by those skilled in the art. For example and without limitation, electronic device **15** can include a smartphone or other such personal electronic device having a touch sensitive display, for example, an iPhone or Android smartphone device and the like that are commercially available.

Preferably the electronic device **15** is received or mounted within the interior of the housing **12** such that the electronic device display **17** is viewable when the user is looking through the housing **12**. By way of further example, the electronic device **15**, can be mounted on the housing such that it defines the back surface of the viewer. It can be appreciated that other configurations for the viewer **10** are envisioned without departing from the scope of the invention.

As shown in FIG. **2**, which is a back view of the viewer (the terminology back side of refers to the side that the user looks into), preferably the housing **12** is configured to receive the electronic device **15** such that the touch sensitive display **17** of the device **15** is centered in a vertical direction **80** and/or a horizontal direction **85**.

As shown in FIGS. **1** and **2**, in some implementations, the housing includes one or more lenses **70** disposed therein arranged to be in alignment with the user's eyes when the user looks into the viewer. Generally, lenses **70** are mounted such that light from the display of the electronic device passes through lenses **70** to the user's eyes. The configuration, construction and placement of a lens or lenses **70** for use in virtual reality viewers are generally known and understood by those skilled in the art.

A view divider **20** can also be disposed within the housing. FIG. **4** is a perspective view of an exemplary configuration of a viewer **10** without a top, bottom and sides and showing the interior space of the viewer including the view divider **20**. FIG. **5** shows a bottom view of the interior of an exemplary viewer **10** including view divider **20** and having the left and right, bottom and front sides removed. Referring to FIG. **5**, the view divider **20** is configured to isolate the field of view of the left eye from the right eye. In other words, the view divider serves to obstruct the right eye from seeing or receiving images displayed by the left portion **19** of the display **17** of the electronic device **15** and the left eye from seeing images displayed by the right portion **18** of the display **17**. It should also be appreciated that the particular width of the left and right portions of the display that are actually viewable by the user can vary depending on the lenses. In some implementations view dividers are not used.

Between the left and right portion of the display **17** is a central portion **14** of the display. The central portion of the display is not viewable by either the left or right eye due to the view divider **20**, and, in addition or alternatively, due to the optical characteristics of the lenses **70**. The width of the central portion **14** can range from the width of the view divider **20** but can be larger depending on the optical characteristics of the lenses **70**. The central portion **14** that is not viewable by either the left or right eye can also vary in shape depending on the optical characteristics of the lenses. For example, it might be rectangular or an hour glass shape that is wider towards the top and bottom sides of the viewer and narrower in the middle section of the display **17**.

In one arrangement, the viewer **10** is configured to include one or more input devices that are configured to receive user inputs at the exterior of the viewer and provide such inputs

directly to the touch sensitive display 17. The input devices can be configured to be passive and/or active input devices.

Preferably the inputs are provided to the display at the central portion 14 of the display, however one or more of the user inputs can be provided to the electronic device at alternative portions of the display 17 as well. Because the central portion 14 of the display is not viewable by the left or right eye to, by providing inputs at the central portion 14, the viewer 10 is capable of providing inputs to the electronic device 15 in a manner that does not disturb the field of view of the left or right eye. Moreover, because the device 15 is received within the housing and preferably positioned such that the display 17 portion of the device is generally centered in at least a horizontal direction and often in vertical direction as well, providing inputs in the central portion 14, for example, where the view divider 20 is proximate to the display 17, allows the systems and methods disclosed herein to be useable with a wide variety of touch sensitive smart-phone devices of various sizes and screen layouts. More-over, software can be configured universally to these touch points regardless of the shape or size of the device because of the centered location.

An exemplary implementation of a viewer including an input mechanism in accordance with an embodiment of the invention is shown in FIG. 6A-6B, which depict a cross-sectional view and of the exemplary viewer 10, including the view divider 20 and the electronic device 15 from the side and back perspective respectively. As shown, the viewer includes input devices that include one or more touchscreen inputs (26a-26d). In this particular exemplary configuration, the touchscreen inputs (26a-26d) are disposed on the distal surface 22 of the view divider 20. Preferably, the electronic device 15 is mounted in a manner such that the touch sensitive display 17 of the device 15, is proximate to (or is touching) at least a portion of the distal surface 22 of the view divider 20, such that the display 17 (not shown from this particular perspective) of the device is in physical contact with the surface of the touchscreen input portion of the input mechanism.

As most smartphones have capacitive touch sensitive displays, in an exemplary implementation, the touchscreen inputs (26a-26d) are constructed from a conductive material, for example, a conductive foam or polymer and the like as are used as the tip of a stylus configured for use with a capacitive touch screen. A compressible material will allow the housing to accommodate devices of varying thicknesses and create a capacitive connection between the display and the touchscreen inputs without the screen touching other portions of the surface 22, for example, to prevent scratching of the screen, provide communicative connection between touchscreen input and the touchscreen without cross-talk and other such considerations.

Preferably, the touchscreen inputs (26a-26d) are electrically coupled to one or more user inputs (29a-29d) that are configured to receive user interactions while using the viewer. Preferably the user inputs (29a-29d) are exposed on the outer surfaces of the housing or positioned on the exterior of the housing 12 such that the user can interact with the user inputs (29a-29d) while using the viewer 10, although other configurations are envisioned without depart-ing from the scope of the invention. The user inputs are configured to sense/detect or receive the user interactions and transmit/transfer/relay the user interaction to the touch sensitive display via the touch screen inputs (26a-26d). In some implementations, the user inputs relay the user inter-actions to the touch screen inputs (26a-26d) via input leads (28a-28d), respectively. For example and without limitation,

input leads can be conductive wires/leads that electrically couple the user inputs (29a-29d) to touchscreen inputs (26a-26d).

In such an exemplary configuration in which the input device is a passive input device, the user inputs (e.g., 29a-29d) are preferably constructed of conductive material, for example, a metalized polymer, conductive polymers, conductive/capacitive inks, carbon based inks or other such inks designed to activate capacitive screens. Accordingly, a user touch of a conductive user input (e.g., 29a), via the conductive lead (e.g., 28a) and touchscreen input (e.g., 26a), will alter the electrical properties of the portion of the display 17 that is in contact with the touchscreen input.

As will be understood by those skilled in the art, the device 15 having a capacitive touch sensitive display 17 can detect the particular location of a change in the electrical property that is caused by the user touch of the user input (e.g., 29a). As would be understood by those skilled in the art, based on the particular location of the sensed change, the device 15, which has a processor executing instructions in the form of code, can interpret that an electrical change sensed at a particular location on the display 17 corresponds to a user interaction with a particular user input and corre-sponds to a prescribed input instruction, for example, a left mouse click or a right mouse click, or a double click, or as the user moving a cursor, or other such functions. Moreover, it would be understood that other combinations of user interactions sensed by the touch sensitive display can be interpreted as one or more of a number of user inputs such as pushing all 4 buttons at once could represent grabbing a virtual item. The 3 dimensional physical interaction offered by the users hands wrapping around the virtual reality viewer and interacting with the inputs can more easily be translated into 3 dimensional virtual interactions in a more natural way then previous user input mechanisms used today. It should also be understood that the arrangement of the touchscreen inputs the corresponding user inputs and associated functions can be pre-defined in software that is loaded into and executing in the device 15 processor.

Although an exemplary passive input device configura-tion having 4 distinct user inputs has been disclosed, it can be appreciated that other passive input device configurations are envisioned. For example, an array of user inputs and corresponding touchscreen inputs can be provided. It should also be understood that other active input device configu-rations can also be implemented in accordance with the disclosed embodiments without departing from the scope of the invention.

Although FIG. 6A shows the user inputs positioned on the top and bottom surfaces of the housing 12 and also shows that the leads run through the view divider 20 and through the top and bottom surfaces of the housing to corresponding user inputs, it can be appreciated that the leads can run through any portions of the housing. It can be further appreciated that any number of the user inputs (29a-29d) can be located on any portion of the housing and in any orientation or configuration. Moreover, it can be further appreciated that any number of touchscreen inputs (e.g., 26a-26d) can be located on the distal end 22 and in any orientation or configuration.

Moreover, although the exemplary configuration provides the user inputs to the screen 17 at the central portion 14 of the display 17 via the view divider 20, other configurations are possible. For example, the viewer can provide such touchscreen inputs (e.g., 26a-26d) on a surface that abuts one or more other portions the display 17.

7

8

In accordance with the disclosed embodiments of the invention, the exemplary viewers can be configured to allow the user to mechanically induce an electrical/capacitive touch event on the touchscreen. Further to the foregoing exemplary embodiments of the invention, additional exemplary configurations of a viewer having an input mechanism, which is also referred to as the user input assembly, configured to induce a capacitive touch event that is detectable by a touchscreen based on mutual-capacitance are further described herein. It can be appreciated that the exemplary implementation described herein can be adapted to mechanically induce input events on a variety of types of touchscreens (e.g., resistive touchscreen events, touch events). Additional exemplary configurations of the viewer in accordance with the disclosed embodiments are further described herein in relation to FIGS. 7 A-7F.

FIG. 7C depicts a perspective view of a viewer **700** assembled and having a front side open showing the generally hollow interior of the viewer. Also shown is an input mechanism **715**. The input mechanism is disposed within the interior **702** of the housing of the viewer **700**. Moreover, at least a portion of the input mechanism is also accessible from the exterior of the viewer such that a user can interact with the input mechanism and cause the portion of the input mechanism contained within the housing to generate a touch input on the touch interface. More specifically, the input mechanism is moveable within the interior between at least a first position (also referred to as an unactuated state), in which a portion of the input mechanism is retracted so as to not contact a touchscreen of the mobile device, and an extended position (also referred to as the actuated state) in which a surface of the input mechanism contacts the touchscreen of the mobile electronic. As shown, at least a portion of the input mechanism is centrally located within the housing and defines at least a portion of a view divider **710**. It should be appreciated that the housing and or one or more portions of the input mechanism further described herein can be comprised of a variety of materials such as plastics, metals, composites, woods and other heavy paper-like materials (e.g., cardboard) and or other such natural and synthetic materials.

FIG. 7A depicts the view divider **710** with one side of the view divider folded back so as to expose a portion of the user input mechanism **715** disposed within the interior of the viewer **700**. The diagram also shows the user input mechanism **715** in an unactuated state.

As shown, FIG. 7A depicts a distal end **720** of a user input portion of the user input mechanism, which in this exemplary implementation is a lever. The proximal end (not shown) of the lever is accessible to a user from outside the viewer when assembled. The diagram depicts the input assembly **715** in an unactuated state. Also shown is an electrical shield **725**. The electric shield is arranged such that at least a portion of the electric shield is configured to contact the touch-screen of the mobile electronic device when the input mechanism is in the extended position. The electrical shield is a material configured to, when brought in proximity to and/or touches the touchscreen, induce a touch event that is electrically detectable by the touchscreen/device. In some implementations, the electrical shield material can be a metallized textile/fabric or films, e.g., polymer film coated with a thin layer of metal, for example PET (Polyethylene terephthalate) films and Mylar (BoPET Biaxially-oriented polyethylene terephthalate). Such metalized materials are commonly used in anti-static bags. Moreover, the electrical shield can be comprised of other metallic conductors, non-metallic conductors, metallized fabrics,

metallized polymers, conductive polymers, conductive fabrics, flexographic inks, rigid flex printed circuit board (PCB) and the like. As would be understood by those skilled in the art, such materials have electrical properties that, when a surface of the material is brought in proximity to a touchscreen and/or touches a touchscreen, can affect the electrical properties detected at that location by the touchscreen device. Other materials having the requisite electrical properties can also be used, for example, inks or pastes with carbon such as black flexographic inks having capacitive touch properties that are printed on substrates. Moreover, it can be appreciated that a combination of materials can be used to provide a surface of the input mechanism that is configured to induce a detectable touch input when the surface is touched to the touchscreen. For example, the electric shield can include a conductive polymer arranged to selectively contact the touchscreen and that is electrically coupled to a metallized fabric or conductive ink applied to a surface of the housing and/or input mechanism.

In some implementations, the electric shield is configured (e.g., sized and/or positioned) so as to have capacitive properties sufficient to be detected by a capacitive touchscreen when the input mechanism is in the extended position and in the absence of human contact with the electric shield. However, it can also be appreciated that, in some implementations, the electric shield can be electrically coupled to the portion of the input mechanism that is interacted with by the user such that electrical properties of the user's body can be utilized to induce the touch input.

Also shown is a coupling **730** that is configured to move the input mechanism towards the touchscreen when the lever is actuated. The coupling is a linkage that couples the portion of the input mechanism that is accessible to the user from the exterior (e.g., the proximal end of the lever) to the surface of the input mechanism configured to touch the touchscreen and induce a touch input. The coupling mechanically translates user actuation of the portion of the input mechanism from the exterior of the housing into movement of the input mechanism within the interior of the housing and causing a surface of the input mechanism to touch the touchscreen. For example, in the particular implementation shown in FIGS. 7A-7F, actuation of the lever causes the coupling to deform and extend in a direction towards the touchscreen, which in turn moves a portion of the electrical shield towards the touchscreen. Furthermore, as shown in FIG. 7A the coupling can be coupled to the housing. As can be appreciated, coupling one or more portions of the input mechanism to the housing can serve to support the input mechanism as well as guide the movement of the input mechanism during user actuation.

The coupling can be comprised of one or more flexible materials such as plastics, metals, composites, woods and other heavy paper-like materials (e.g., cardboard) and or other such natural and synthetic materials. A linkage or coupling that is flexible can be beneficial in that the material memory causes the coupling to return to a resting state when pressure is released from the lever which automatically pulls the input mechanism away from the touchscreen. However, alternative methods for automatically retracting the contact surface of the input mechanism can be similarly implemented without departing from the scope of the invention.

Although a particular exemplary linkage configuration is described in relation to FIGS. 7 A-7F, it can be appreciated that other linkage configurations can be implemented without departing from the scope of the invention. It can also be appreciated that, although the lever, coupling and metallic shield have been described as individual components, the

subject invention is not so limited as one or more of the foregoing components can be joined or integrally formed as single unit. Similarly, it can also be appreciated that one or more of the components of the input mechanism can be joined to the housing or integrally formed with the housing m a permanent or temporary fashion using any conventional manufacturing techniques.

In some implementations, a compressible pad **735**, for example, a foam or foam-like material can be disposed between the flexible coupling and the electric shield. The pad can be placed between the flexible coupling and the electrical shield **725** in at least the location where the coupling contacts the metallic shield when extended (e.g., the back side of the electrical shield where the front side of the shield material contacts the touchscreen when extended). It can be appreciated that the electrical shield can be attached to the foam material or unattached. It can also be appreciated that the pad can be coupled to the coupling either directly or indirectly by one or more intermediate structures that comprise the input mechanism. The pad is used to create a sufficiently sized contact surface between the front side of the shield material and the touchscreen so as to register a touch input event on the screen (e.g., to simulate the size and shape of a finger). The pad also helps the surface of the input mechanism configured to touch the touchscreen (i.e., the shield material) conform to the touchscreen surface when the input mechanism is in the extended position/actuated state.

It can be appreciated that various sizes and shapes of the pad can be used to induce a sufficient sized contact surf ace. It can also be appreciated that in some implementations the pad can be omitted. It can also be appreciated that the metallic shield and pad may be integrated or combined into a single material such as conductive foam gaskets used in Electromagnetic Interference (EMI) or Radio Frequency Interference (RFI) applications. It can also be appreciated that the pad can be sized and/or shaped such that actuating the input mechanism with greater force causes a greater surf ace area of the electrical shield to be applied to the screen which can be interpreted differently by the device than when a smaller surface area is detected by the touchscreen. This input mechanism configuration can be used to provide a secondary signal for detecting the amplitude of the users input, for example a method for detecting the amount of force the user applied to the input.

A portion of the lever can be attached to or in communication with (i.e., touching) or integrally formed to at least a portion of the coupling. For instance, as shown, the distal end of the lever can be abutting a portion of the coupling such that, when the lever is actuated at a proximal end, movement of the distal end of the lever causes the plastic coupling to buckle and at least a portion of the coupling extends in the direction towards the touchscreen. In addition or alternatively, the coupling can be a structure that is flexibly coupled to one or more portions of the housing such that it moves in a prescribed manner when a lever is moved or a button is pushed by the user.

FIG. **7** A depicts the view divider **710** with one side of the view divider folded back so as to expose the user input assembly **715** disposed within the view divider of the viewer **700**. The diagram also shows the user input assembly **715** in an unactuated state.

FIG. **7**B depicts the view divider **710** with one side of the view divider folded back so as to expose the user input assembly **715** disposed within the view divider of the viewer **700**. The diagram also shows the user input assembly **715** in an actuated state.

FIG. **7**C depicts a perspective view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the housing **700**. The diagram also shows the user input assembly **715** in an unactuated state. As shown, the user input (lever) includes a proximal end portion **722** that extends through a cut-out in the housing of the viewer **700** and is accordingly accessible to the user from the exterior of the housing. It can be appreciated that alternative configurations in which one or more portions of the lever or other such mechanical actuators or portions of the input mechanism is accessible from the exterior of the viewer are envisioned. For instance, the lever can be contained within the interior of the housing and accessible to the user through a cut-out through an external wall of the housing.

FIG. **7**D depicts a side view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer housing **700**. The figure also shows the user input assembly **715** in an unactuated state.

FIG. **7**E depicts a perspective view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer housing **700**. The diagram also shows the user input assembly **715** in an actuated state where the electrical shield is extended out of the cut-out in the view divider.

FIG. **7**F depicts a side view of the viewer **700** assembled and showing the view divider **710** and showing at least a portion of the user input assembly **715** disposed within the interior of the viewer **700**. The diagram also shows the user input assembly **715** in an actuated state where the electrical shield is extended out of the cut-out **712** in the view divider.

When a user device is placed within the viewer, such that the touchscreen is facing the interior of the viewer and near the view divider, actuating the user input assembly by actuating the lever can cause the coupling to flex and therefore cause the electrical shield to extend towards and touch the touchscreen of the user device. In this exemplary implementation, the coupling and shield extend out of a cut-out in the view divider. As a result, the device can detect the change in an electrical property at one or more locations of the screen, which is caused by the electrical shield touching (or approaching) the touch-sensitive display.

Accordingly, it can be appreciated that, what is provided is a virtual reality viewer for use with an electronic touch-screen device comprising a housing for receiving and holding a touchscreen display device within an interior region of the housing. The viewer further comprising an input mechanism that is accessible from an exterior of the housing and is moveable within the interior between at least a first position and an extended position, wherein a surface of the input mechanism is configured to contact the touch-screen of the mobile electronic device when in the extended position. In one particular implementation, the input mechanism comprises a lever having a proximal end that is exposed to the exterior of the housing and a distal end disposed within the housing, whereby the proximal end of the lever is accessible by a user from the exterior of the housing and actuation (e.g., movement) of the lever at the proximal end translates to mechanical movement of the distal end. The viewer further comprising a coupling attached to or in communication with the distal end of the lever such that, when the lever is actuated at the proximal end, movement of the lever causes at least a portion of the coupling to move toward a back wall of the housing, e.g., extend or move in a direction of the touchscreen. The viewer further comprises

an electrical shield, wherein the electrical shield is a material configured to induce a touch event that is electrically detectable by a touchscreen/device when at least a portion of the shield contacts or is in proximity to a touchscreen. In addition, the portion of the electrical shield is positioned between the coupling and the touchscreen such that movement of the coupling advances at least the portion of the electrical shield material toward the touchscreen so as to induce the touch event. Moreover, the viewer can further comprise a compressible pad disposed between the portion of the coupling and the electrical shield, wherein the pad is attached to the coupling and is sized, shaped and has the softness/rigidness to create a sufficiently sized contact point for generating a touchscreen detection event on the touchscreen device. The compressible pad and electrical shield material work to mimic the electrical and physical properties of a human finger so that any form of touch screen technology will register a touch event when the lever mechanism is actuated. As would be understood by those skilled in the art the combination of physical, and electrical properties of this pad electrical shield material can be tuned to work on a variety of touch screen technologies such as capacitive, resistive, or conductive touch screen technologies. As previously noted, in some implementations, one or more components of the exemplary user input assembly can be integrated into or part of the view divider.

According to a salient aspect, the viewer and the exemplary electro-mechanical user input assembly is configured to allow a user to interact with the touch sensitive screen without access to the touch sensitive screen while within the viewer. Moreover, the exemplary viewer and user input assembly can be configured to allow a user to interact with the touch sensitive screen without reliance on the electrical properties of the human body to induce the electrical event. For instance, the metallized film **725** can be sized such that it is suitable for inducing a touch event without requiring user contact therewith. In addition or alternatively, the portion of the metallized film that is configured to touch the screen can be accessible to receiving a user touch. For instance, a portion of the metallized film can be exposed on the lever **722** or otherwise accessible to the user on an external surface.

As would be understood by those skilled in the art, the mobile electronic device, which has a processor executing instructions in the form of code, can detect that electrical property change at the one or more locations and interpret the change as one or more prescribed user interactions. In some implementations, the user interaction can be interpreted as a simple click event. In some implementations, a variety of possible user interactions can be detected as a function of the location of the touch event on the touchscreen (e.g., as caused by different input mechanisms configured to cause touch inputs at respective locations on the touchscreen), the duration of the touch event, the size of the area of the touchscreen registering the touch event, and the like. These detected aspects of the touch event can be interpreted and translated into one or more prescribed input instructions, for example, a left mouse click or a right mouse click, a double click, or as the user moving a cursor, a virtual gesture such as a grab, push, pull, throw, pinch or as a scaled input instruction such as a hold softly or hold firmly or other such functions.

Moreover, user interactions detected by the touch sensitive display can be interpreted in combination with one or more other input devices. More specifically, a user interaction detected can be interpreted in light of other input data received by the user device from other on-board input devices or data sources, for example and without limitation, an accelerometer that detects the orientation and location of the device or a camera or 3d scanner that detects the physical environment of the user or portions of the user's body position. In addition, the housing can also include one or more additional user input devices electrically coupled to the mobile device by a wireless or wired connection, such that inputs via the electro-mechanical input mechanism can be provided to the mobile device in addition to inputs provided using the additional input device. For example, based on the orientation and location of the device and the information being viewed by the user on the device, the device can determine that a user is looking at an interactive virtual icon using the viewer. Paired with the user actuation of the user input mechanism and the detection of a touch input, the device can interpret the combined user input (e.g. accelerometer data and the touch interaction data) as a "mouse click" on that particular virtual icon or as a grab or hold of that virtual item or icon. Another example might be combining the accelerometer data for device position, camera data from the device capturing the user's physical environment, and a touch event from the mechanism described in this invention in a way that allows the user to select a real physical item to scan/import into a virtual or augmented reality interface allowing for the digital manipulation of the physical item or overlaying additional information about the physical item.

It can also be appreciated that the user input mechanism can be adapted to induce user interactions at a variety of different locations or multiple user input assemblies can be provided to facilitate more complex user inputs.

It is to be understood that like numerals in the drawings represent like elements through the several figures, and that not all components and/or steps described and illustrated with reference to the figures are required for all embodiments or arrangements.

The subject matter described above is provided by way of illustration only and should not be construed as limiting. The terminology used herein is for the purpose of describing particular embodiments only and is not intended to be limiting of the invention. As used herein, the singular forms "a", "an" and "the" are intended to include the plural forms as well, unless the context clearly indicates otherwise. It will be further understood that the terms "comprises" and/or "comprising", when used in this specification, specify the presence of stated features, integers, steps, operations, elements, and/or components, but do not preclude the presence or addition of one or more other features, integers, steps, operations, elements, components, and/or groups thereof.

Also, the phraseology and terminology used herein is for the purpose of description and should not be regarded as limiting. The use of "including," "comprising," or "having," "containing," "involving," and variations thereof herein, is meant to encompass the items listed thereafter and equivalents thereof as well as additional items.

The subject matter described above is provided by way of illustration only and should not be construed as limiting. Various modifications and changes can be made to the subject matter described herein without following the example embodiments and applications illustrated and described, and without departing from the true spirit and scope of the present invention, as set forth in each and any of the following claims.

The invention claimed is:
**1**. A virtual reality viewer for use with a mobile electronic device having a touchscreen, the viewer comprising:

a first lens and a second lens, wherein the first lens is facing the same direction as the second lens, and wherein the first lens and the second lens are spaced apart in a horizontal direction;

an enclosure having a first side and a second side opposite the first side, the first side configured to hold the first lens and the second lens, the second side configured to receive the mobile electronic device;

a touchscreen input constructed of conductive material, wherein the touchscreen input is in physical contact with the touchscreen upon receipt of the mobile electronic device.

**2.** The virtual reality viewer of claim **1**, further comprising a user input that is accessible from an exterior of the enclosure and is conductively coupled to the touchscreen input.

**3.** The virtual reality viewer of claim **2**, further comprising a lead that conductively couples the touchscreen input to the user input, wherein a portion of the lead runs through a portion of the enclosure.

**4.** The virtual reality viewer of claim **1**, further comprising a second touchscreen input constructed of conductive material, wherein the second touchscreen input is generally centered between the first lens and the second lens in the horizontal direction and in physical contact with the touchscreen upon receipt of the mobile electronic device.

**5.** The virtual reality viewer of claim **4**, wherein the touchscreen input is offset upwards in a vertical direction and the second touchscreen input is offset downwards in the vertical direction.

**6.** The virtual reality viewer of claim **4**, wherein the user input is a metal or conductive polymer.

**7.** The virtual reality viewer of claim **1**, wherein the touchscreen input is offset in the vertical direction.

**8.** The virtual reality viewer of claim **1**, wherein the first lens and the second lens are configured to facilitate a three-dimensional viewing experience.

**9.** The virtual reality viewer of claim **1**, wherein the touchscreen input is generally centered between the first lens and the second lens in the horizontal direction.

**10.** The virtual reality viewer of claim **1**, wherein a portion of the enclosure has a cut-out, and wherein at least a portion of the user input is accessible through the cut-out.

**11.** The virtual reality viewer of claim **1**, wherein the conductive material is a conductive foam or polymer.

**12.** A virtual reality viewer for use with a mobile electronic device having a touchscreen, the viewer comprising:

a first lens and a second lens, wherein the first lens is facing the same direction as the second lens, and wherein the first lens and the second lens are spaced apart in a horizontal direction;

an enclosure having a first side and a second side opposite the first side, the first side configured to hold the first lens and the second lens, the second side configured to receive the mobile electronic device;

a user input that is accessible from an exterior of the enclosure and has a first position and a second position;

a touchscreen input conductively coupled to the user input and generally centered between the first lens and the second lens in the horizontal direction, wherein, upon receipt of the mobile electronic device, the touchscreen input is in physical contact with the touchscreen when the user input is in the second position.

**13.** The virtual reality viewer of claim **12**, further comprising:

a second user input that is accessible from an exterior of the enclosure and has a first position and a second position; and

a second touchscreen input conductively coupled to the second user input, wherein, upon receipt of the mobile electronic device, the second touchscreen input is in physical contact with the touchscreen when the second user input is in the second position.

**14.** The virtual reality viewer of claim **13**, wherein the touchscreen input is offset upwards in a vertical direction and the second touchscreen input is offset downwards in the vertical direction.

**15.** The virtual reality viewer of claim **12**, wherein the touchscreen input is offset in a vertical direction.

**16.** The virtual reality viewer of claim **12**, wherein a portion of the enclosure has a cut-out, and wherein at least a portion of the user input is accessible through the cut-out.

**17.** The virtual reality viewer of claim **12**, wherein the touchscreen input is constructed of a conductive material.

**18.** The virtual reality viewer of claim **17**, wherein the conductive material is a conductive foam or polymer.

**19.** The virtual reality viewer of claim **12**, further comprising a lead that conductively couples the touchscreen input to the user input, wherein a portion of the lead runs through a portion of the enclosure.

**20.** The virtual reality viewer of claim **12**, wherein the user input is a metal or conductive polymer.

* * * * *